hLEON A. CANNIZZARO, Jr., Judge.
The defendant, Joseph Wheeler, was convicted of purse snatching that occurred on April 1, 2003, in violation of La. R.S. 14:65.1 and of being a repeat offender under the Habitual Offender Law, La. R.S. 15:529.1. He was sentenced on January 26, 2004, to twenty years at hard labor. He is now appealing his convictions and his sentence.
STATEMENT OF THE CASE
The State of Louisiana filed a bill of information charging Mr. Wheeler with one count of attempted purse snatching in violation of La. R.S. 14:27(65.1). Mr. Wheeler entered a not guilty plea at his arraignment. The trial court heard and denied Mr. Wheeler’s pre-trial motions, including a motion to suppress the evidence that was seized by the police officers and intended for use against him at the trial.
After Mr.'Wheeler’s first trial ended in a mistrial that was declared during voir dire, the State amended the bill of information to remove the word “attempted” from the phrase “attempted purse snatching.” Mr. Wheeler entered a not guilty plea to the amended bill of information. A second trial ended in a mistrial when the jury was unable to reach a verdict. Mr. Wheeler was tried a third | gtime, and the jury returned a verdict of guilty as charged to the crime of purse snatching.
The trial court initially sentenced Mr. Wheeler to ten years at hard labor. His attorney then filed a motion for a new trial and a motion for a post-verdict judgment of acquittal, both of which were denied. That same day, the court held a hearing on the charge that Mr. Wheeler was a habitual offender and found him to be a second felony offender. The court vacated Mr. Wheeler’s initial sentence and then sentenced him as a habitual offender to twenty years at hard labor. After the hearing on the multiple offender bill of information, the court considered and denied a motion to quash the multiple.offender bill of infor *86 mation and a motion to reconsider the sentence. A motion for appeal was granted.
STATEMENT OF THE FACTS
Shortly after midnight, Jennifer Jette left her home to walk to her boyfriend’s workplace in the French Quarter in New Orleans. She was walking in the 2300 block of Burgundy Street on the left-hand side of the street in the same direction as the one-way traffic was flowing. She heard an approaching vehicle slow down, which caused her to look back. The vehicle, a pick-up truck, was adjacent to her, and the driver looked straight at her. Ms. Jette was frightened by the way the driver looked at her, and she began to run. The driver of the truck, who was its only occupant, jumped out of the vehicle and pursued Ms. Jette. She turned and tried to spray pepper spray in the pursuer’s face. He caught up with her, knocked her to the ground, grabbed her purse, and then ran back to the truck as she was screaming for help. As she watched the truck drive away, she memorized its license plate number.
|oA man in a nearby house came to her assistance and invited her into his home. He gave Ms. Jette a pen and paper on which to write the license plate number of the truck while he called 911. When the police responded to the 911 call, Ms. Jette provided information about the purse snatching to the police.
New Orleans Police Department Officer Alvin Walton, Jr. was one of the first officers to respond to the 911 call. When he did so, he observed that the victim was suffering from the effects of pepper spray, and he observed abrasions on her arms and knees.
Ms. Jette described the perpetrator as a tall black male with a medium Afro hairstyle, who was wearing dark clothing. When Officer Walton used his computer to check the license plate number provided by Ms. Jette, he learned that the vehicle with that number was registered to a person residing at 811/6 St. Ferdinand Street. He instructed the police dispatcher to broadcast the information regarding the truck and the perpetrator to other police officers in the area. Officer Walton also called a detective who was en route to the house where Ms. Jette had sought refuge. Officer Walton asked the detective to drive to the St. Ferdinand Street address to determine whether the truck with the license plate number that Ms. Jette had remembered was there. The detective called Officer Walton a few minutes later and stated that the vehicle was at that location. Furthermore, the hood of the truck was warm, indicating that it had been driven recently. Officer Walton asked Ms. Jette to be available should he need to talk to her, and he then proceeded to St. Ferdinand Street.
When he arrived at the St. Ferdinand Street address, Officer Walton, who was with several other police officers who had also arrived on the scene, knocked 14on the door of the residence there. An older white male walked from the side of the house where there was a gate to meet Officer Walton.
An interview with the resident, Tom Gibson, established that he owned the truck identified by Ms. Jette. He had let a black male who was staying with him borrow the truck earlier that evening.
Mr. Gibson told the officers that the man was inside the house at the St. Ferdinand Street address. The house belonged to Mr. Gibson, and he invited the police officers to come inside. The officers saw Mr. Wheeler, who matched the description of the perpetrator, in Mr. Gibson’s living room. There was also a large quantity of *87 change on a coffee table in the room. The officers detained Mr. Wheeler and contacted Ms. Jette. They asked her to come to their location to participate in a “show-up” identification procedure.[1] When Ms. Jette arrived, she identified Mr. Wheeler as the person who stole her purse. After Ms. Jette identified the defendant at the scene, the police formally arrested him. Ms. Jette also identified Mr. Wheeler later at his trials.
Officer Walton learned from Mr. Gibson that Mr. Wheeler was staying in the front portion of the building where Mr. Gibson lived. When he was asked to consent to a search of the area where Mr. Wheeler was staying, Mr. Gibson did so in writing. The ensuing search resulted in the seizure of some of the property that 15had been taken from Ms. Jette when her purse was snatched, including her driver’s license.
At trial Officer Walton and Ms- Jette testified for the State. Officer Walton testified with respect to the investigation of the purse snatching and the arrest of Mr. Wheeler. Ms. Jette testified regarding the circumstances of the purse snatching. She also said that she had $25.00 in coins in her purse the night it was taken. The coins were from tips that she had earned at her bartending job. Additionally, from photographs that had been taken by the police department crime lab, Ms. Jette identified several items that had been taken from her the night of the purse snatching, including her wallet, photographs of her siblings, her purse, and her address book.
The defense then presented two witnesses at trial, Mr. Gibson and Mr. Wheeler. Mr. Gibson stated that he first became acquainted with Mr. Wheeler when the latter was around eight years old. He also testified that Mr. Wheeler had worked for him periodically in his renovation business. A few days before Mr. Wheeler’s arrest, Mr. Gibson had allowed Mr. Wheeler to sleep in a vacant apartment in the front of the building he owned on St. Ferdinand Street. According to Mr. Gibson, the apartment was one of three in the building. This particular apartment was under renovation, and the defendant was allowed to stay there until it was ready to be rented Mr. Gibson testified that Mr. Wheeler was also working for him at the time.
According to Mr. Gibson’s testimony, on the night of the incident, Mr. Gibson had prepared dinner for Mr. Wheeler. After he had eaten, Mr. Wheeler went to the front apartment. He told Mr. Gibson that he was expecting company. After Mr. Gibson went to bed, Mr. Wheeler woke Mr. Gibson and asked to borrow |fiMr. Gibson’s truck to drive his cousin home. Mr. Gibson agreed to let him borrow the truck and then went back to sleep. He awakened a few times, because he was concerned about his truck, but each time he checked it was still gone. Finally, about twenty minutes after midnight, Mr. Gibson went downstairs and found Mr. Wheeler sitting in the living room watching television. Mr. Gibson told Mr. Wheeler to go to bed, because they had to work the next morning. Approximately twenty-five minutes later, Mr. Gibson again went to the living room where Mr. Wheeler was still watching television. Mr. Gibson again told Mr. Wheeler to go to *88 bed. At about that time, the doorbell rang, and Mr. Gibson went outside where he saw a police officer who asked him about his truck. According to his testimony, Mr. Gibson stated that he told the officer that he had loaned his truck to Mr. Wheeler earlier that night. Mr. Gibson told the officer that Mr. Wheeler was at his house, and he invited the officer inside. Subsequently, Mr. Wheeler was arrested.
Mr. Gibson testified that after the arrest but before the police left, he found a large quantity of change under some newspapers on the coffee table in his living room. He went outside and told the police about the money.
Mr. Gibson further testified that he did not give anyone but Mr. Wheeler permission to drive his truck. Also, he said that Mr. Wheeler never told him that the truck had been loaned to anyone else.
Mr. Wheeler testified that he had been staying with Mr. Gibson for three days prior to his arrest and that he had previously been in jail for eight and one-half months for violating his probation on a cocaine charge. According to Mr. Wheeler, on the night of the crime, he had borrowed Mr. Gibson’s truck to drive his cousin home. Instead of returning directly to the residence, he stopped at a neighborhood bar to play pool. There he encountered a friend, Lorenzo Dupre, who |7offered to introduce his girlfriend’s sister to Mr. Wheeler. Because Mr. Gibson’s truck could only seat three people in the cab, Mr. Wheeler let Mr. Dupre use the truck to get his girlfriend and her sister. Mr. Dupre was to return to the residence on St. Ferdinand Street with the two women.
Mr. Wheeler stated that he then returned to Mr. Gibson’s house to wait for Mr. Dupre and the two women. According to Mr. Wheeler, after cleaning up the apartment where he had been staying, he went to Mr. Gibson’s living room to wait for Mr. Dupre’s return. While Mr. Wheeler was waiting, Mr. Gibson came downstairs and spoke with him, telling him that he should go to sleep so that he could work the next morning.
Mr. Wheeler said that he then went outside to wait for Mr. Dupre. When he arrived, however, Mr. Dupre was accompanied only by his girlfriend. His girlfriend’s sister had not come with them. Mr. Wheeler testified that Mr. Dupre had a purse in his possession. Mr. Wheeler assumed that it belonged to Mr. Dupre’s girlfriend. When Mr. Wheeler asked Mr. Dupre if he had put gas in the truck, Mr. Dupre reached into the purse and gave Mr. Wheeler a bank envelope containing change to pay for gas. Mr. Wheeler said that he told Mr. Dupre and his girlfriend they could “chill in the front apartment.”
Mr. Wheeler then returned to Mr. Gibson’s living room. Mr. Wheeler testified that he intended to drive Mr. Dupre and his girlfriend home later. As he watched television in the living room, Mr. Wheeler counted the change in the envelope, which equaled approximately twenty-five dollars. While Mr. Wheeler was counting the change and watching television, Mr. Gibson came back into the living room and again told Mr. Wheeler to go to bed.
18WhiIe Mr. Gibson was telling Mr. Wheeler to go to bed, the doorbell rang. Mr. Gibson went to answer it, and Mr. Wheeler testified that the police entered the living room with their guns drawn. The officers handcuffed Mr. Wheeler and walked him outside. Mr. Wheeler further testified that when he was taken outside, a woman across the street identified him as the person who snatched her purse.
During the trial that resulted in a guilty verdict, Mr. Wheeler was asked whether he had told Mr. Gibson that he had loaned *89 the truck to someone else, and he denied having done so. The prosecutor then attempted to impeach Mr. Wheeler with his testimony from the proceeding which ended in a mistrial. At that trial, according to the transcript, Mr. Wheeler had testified that he did tell Mr. Gibson that he had loaned the truck to someone. Mr. Wheeler denied making that statement to Mr. Gibson, and he denied giving the prior testimony that was reflected in the transcript. Mr. Wheeler also testified that he did not know when Mr. Dupre and his girlfriend left the apartment, and he testified that he did not take Ms. Jette’s purse.
ERRORS PATENT
La.C.Cr.P. art. 873 provides as follows:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
In State v. Augustine, 555 So.2d 1331, 1334 (La.1990), the Louisiana Supreme Court held that the trial court’s failure to observe the twenty-four hour delay did not constitute harmless error even where the defendant failed to raise that issue on appeal. In Augustine, the defendant had challenged his sentence on |3appeal. The Supreme Court, therefore, held that the error in Augustine was not harmless.[2]
In State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991), this Court discussed the Augustine case as follows:
In State v. Augustine, 555 So.2d 1331 (La.1990), the Supreme Court held that the trial court’s failure to observe the twenty-four hour delay did not constitute harmless error, even if the defendant did not raise that issue as error on appeal, where the defendant challenged his sentence on appeal. In the present case, defendant does not challenge his sentence and he does not raise as error the failure of the trial court to wait twenty-four hours before imposing sentence. Therefore, this error is harmless.
584 So.2d at 359. Only where the defendant does not challenge his sentence on appeal is it harmless error for a court to impose a sentence without complying with the twenty-four hour delay.
In the instant case, Mr. Wheeler has filed a pro se assignment of error in which he asserts that his sentence is unconstitutionally excessive. He also filed a motion to reconsider his sentence within thirty days of its imposition in accordance with La.C.Cr.P. art. 881.1.
At Mr. Wheeler’s sentencing hearing on his conviction for the crime of purse snatching, he received a ten-year sentence, and the trial court noted that he had been convicted of a crime of violence. On that same day, after a hearing on the multiple offender bill of information, Mr. Wheeler was adjudicated to be a second felony offender. Mr. Wheeler’s original sentence of ten years was vacated, and the |intrial court judge re-sentenced him to twenty *90 years at hard labor. Again, the trial court judge noted that Mr. Wheeler had been convicted of a crime of violence.
On the same day, but immediately after sentence was imposed for the conviction of the crime of purse snatching, the trial court judge denied a motion for a new trial and a motion for a post verdict judgment of acquittal. Therefore, when Mr. Wheeler was sentenced on the same day that these motions were denied, the judge failed to comply with the requirements of La.C.Cr.P. art. 873, which mandates a twenty-four hour delay before a sentence can be imposed after the denial of a motion for a new trial or a post verdict judgment of acquittal absent a waiver of the delay. There is nothing in the record to indicate that Mr. Wheeler waived the delay. Therefore, we find that the failure to wait twenty-four hours after the motions were denied constituted an error patent. Thus, Mr. Wheeler’s sentence for the crime of purse snatching is vacated.
The proper sequence of events that should have been followed in this case is as follows:
1. The motion for a new trial and a motion for a post verdict judgment of acquittal should have been entertained prior to the actual sentencing for the crime of purse snatching.
2. Once these motions were denied, there should have been a twenty-four hour delay before the sentencing or an express waiver of that delay on the record.
3. The sentence for the crime of purse snatching should have been imposed after the twenty-four hour delay, and then the motion to quash the multiple offender bill of information should have been heard.
1^4. The trial on the multiple offender bill of information should have been held after the motion to quash the multiple offender bill of information was entertained and denied.
5. Once Mr. Wheeler was adjudicated a second felony offender, his sentence for the crime of purse snatching should have been vacated.
6. Finally, he should have been sentenced under the Habitual Offender Law.
Because the proper sequence was not followed in the instant case, we must vacate Mr. Wheeler’s sentence for both the crime of purse snatching and for his adjudication under the Habitual Offender Law. Only if a defendant waives the delay mandated by La.C.Cr.P. art. 873, can a sentence for either the current conviction or in connection with a conviction under the Habitual Offender Law be imposed. Therefore, this case is remanded for sentencing on the conviction for the crime of purse snatching and sentencing under the Habitual Offender Law after the initial sentence for the crime of purse snatching is vacated.
DISCUSSION
Mr. Wheeler has raised two assignments of error. One he raised in a pro se assignment of error, and the other was raised through his appellate counsel.

Pro Se Assignment of Error: The sentence imposed is unconstitutionally excessive.

Mr. Wheeler filed a motion with this Court for a reconsideration of his sentence, which we will consider to be a pro se assignment of error on appeal. Because we have vacated Mr. Wheeler’s sentence, this assignment of error is now moot. On remand the trial court judge will re-sentence Mr. Wheeler. If Mr. Wheeler believes that the sentence imposed upon remand is excessive, he has the right to appeal that sentence.
*91 | ^Assignment of Error: The trial court erred in denying Mr. Wheeler’s motion to suppress the evidence seized from the search of the apartment where he had been staying.
Mr. Wbeeler asserts that the search of the apartment where Mr. Gibson had given him permission to sleep was illegal. He contends that Mr. Gibson had no right to consent to the search of the apartment. Therefore, he argues that before a valid search could be conducted, a search warrant would have to be obtained, and it was not.
Both the federal and the state constitutions prohibit unreasonable searches and seizures, including the seizure of evidence without a warrant. U.S. Const. Amend. IV[3]; La. Const. Art. 1, § 5[4]. A search made without a properly issued warrant is unreasonable per se subject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); State v. Thompson, 2002-0333, p. 6 (La.4/9/03), 842 So.2d 330, 335; State v. Hamilton, 2000-1176, p. 5 (La.App. 4 Cir. 9/13/00), 770 So.2d 413, 417. Consent to a search that is freely and voluntarily given by a person who has common authority or other sufficient relationship to the | ^premises sought to be searched is an exception to the warrant requirement. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); State v. Edwards, 97-1797, p. 11 (La.7/2/99), 750 So.2d 893, 901.
In Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the United States Supreme Court considered whether the person consenting to a war-rantless search of premises has to, in fact, possess common authority over the premises. The Supreme Court held that a war-rantless search is valid when it is based ón the consent of a third party whom the police, at the time of the entry onto the premises, reasonably believe has common authority over the premises, even if he does not have that authority. Id.
The issue we must decide is whether the police reasonably believed, at the time they were given access to the apartment in which Mr. Wheeler had been staying, that Mr. Gibson had common control with Mr. Wheeler over the apartment. In making our decision, we can consider not only the evidence presented at the hearing on the motion to suppress the evidence but also the testimony presented at the trial. State v. Seward, 509 So.2d 413, 416 fn. 8 (La.1987).
In the instant case, Mr. Wheeler had just been released from jail and had been staying in the apartment in the building owned by Mr. Gibson for only three days. Mr. Gibson had prepared the evening meal *92 for Mr. Wheeler the night of the purse snatching, and Mr. Wheeler was given access to the living room in Mr. Gibson’s living quarters. When Mr. Wheeler was watching television in the living room, Mr. Gibson had to remind Mr. Wheeler to go to bed, because they both had to work the next day. Mr. Gibson allowed Mr. Wheeler to borrow his truck, and he testified that “Joseph’s been a friend of mine for a long time.” Mr. Gibson testified [ 14that the apartment where Mr. Wheeler was staying was essentially unlivable but that it had a functional bathroom. There was no electricity in the apartment, and some of Mr. Gibson’s possessions were in it. The apartment had to be renovated before Mr. Gibson could rent it. Mr. Gibson was letting Mr. Wheeler stay in the apartment without paying rent while he was working for Mr. Gibson, who was in the renovation business. There was no lock on the door to the apartment, and it could be accessed by anyone.
Mr. Wheeler testified that he “was staying with Mr. Gibson at 809 St. Ferdinand.” Mr. Wheeler also stated that “Tom is like a father to me ...” It was clear from Mr. Wheeler’s testimony at the trial that Mr. Gibson permitted Mr. Wheeler to use portions of his apartment for eating, watching television, and reading the newspaper. Mr. Wheeler even used Mr. Gibson’s living room to count the coins that belonged to Ms. Jette.
The circumstances described by Mr. Gibson and Mr. Wheeler reveal that Mr. Wheeler should have had no reasonable expectation of privacy with respect to the apartment where he was staying. It was easily accessible to Mr. Gibson at any time. Mr. Gibson treated Mr. Wheeler almost as if he were a houseguest or an adult child living with him. Mr. Gibson prepared Mr. Wheeler’s evening meal, permitted Mr. Wheeler to have free access to his own living quarters, provided transportation for Mr. Wheeler when he needed to drive someone home, and even told him when to go to bed. We do not find that there was a landlord-tenant relationship between Mr. Gibson and Mr. Wheeler at all. Rather, Mr. Gibson seemed to be acting as a parent or good friend might act by giving Mr. Wheeler a place to stay when he had just been released from jail with no money or possessions.
|1BWe find that Mr. Gibson did, in fact, have control over the access to the apartment where Mr. Wheeler slept. There was nothing to indicate that Mr. Gibson could not have gone into the apartment at any time without Mr. Wheeler’s permission. Therefore, Mr. Wheeler did not have a reasonable expectation of privacy with respect to the apartment.
The situation in the instant case is very similar to the situation where a guest is permitted to use a bedroom in a home but is not given sole control or access to the room. Mr. Wheeler even acknowledged that he was “staying with Mr. Gibson.” In a guest host relationship, such as we find here, the owner of the home is permitted to lawfully consent to a search of the bedroom occupied by the guest. See, e.g., State v. Edwards, 97-1797 (La.App. 4 Cir. 7/2/99), 750 So.2d 893.
We also find that it was reasonable for the police to assume that Mr. Gibson had control over the apartment in which he was letting Mr. Wheeler stay. Mr. Gibson freely and voluntarily gave his consent for the police to search the apartment and told them they could go in the apartment without him, because there was no lock on the door. Mr. Gibson also executed a written consent for the police to search the apartment.
Based on the foregoing discussion, we find that Mr. Gibson freely consented to a search of the unlocked apartment and that *93 the police reasonably believed he had the authority to consent. The evidence obtained pursuant to the search of the apartment where Mr. Gibson permitted Mr. Wheeler to sleep was legal. Therefore, the motion to suppress the evidence was properly denied.
CONCLUSION
Mr. Wheeler’s conviction for the crime of purse snatching is affirmed, and his conviction as a repeat offender under the Habitual Offender Law is affirmed. |1(;His sentence for the crime of purse snatching is vacated, and his sentence under the Habitual Offender Law is also vacated. This case is remanded for Mr. Wheeler to be re-sentenced on his purse snatching conviction and on his adjudication as a repeat offender under the Habitual Offender Law.
PURSE SNATCHING CONVICTION AFFIRMED, HABITUAL OFFENDER ADJUDICATION AFFIRMED, SENTENCES VACATED, AND REMANDED.

. Officer Walton explained that Ms. Jette was driven to the St. Ferdinand Street address and remained in the car while Mr. Wheeler was standing directly across the street from the car. The police illuminated Mr. Wheeler with bright lights so that Ms. Jette could see Mr. Wheeler and so that it would be difficult for Mr. Wheeler to see her. The “show-up” identification procedure is sometimes used by police when a suspect is caught shortly after a crime has been committed and the victim is available to make an identification.

. In State v. Martin, 93-1915 (La.App. 4 Cir. 9/29/94), 643 So.2d 830, this Court noted that the Augustine case was legislatively overruled. A defendant must file a motion to reconsider a sentence within 30 days of its imposition in accordance with La. C.Cr.P. 881.1. Otherwise, the defendant is precluded from challenging the sentence on appeal. 93-1915, pp. 2-3, 643 So.2d at 832. In the instant case, a timely motion to reconsider the sentence was filed.

. The Fourth Amendment to the United States Constitution reads as follows:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

. Article 1, § 5 of the Louisiana Constitution reads as follows:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.