ROSEMARYLEDET, Judge.
| j Marcus Pleasant appeals his conviction and life sentence for second degree murder, asserting that the evidence failed to *249 support the jury’s verdict. Finding no error, we affirm.

STATEMENT OF THE CASE

On June 23, 2005, the State of Louisiana obtained an indictment charging Mr. Pleasant with the first degree murder of Alissa Kovach.[1] Mr. Pleasant subsequently pled not guilty to the charge. The court denied Mr. Pleasant’s motion to suppress the statement on October 15, 2009. The State amended the charge to second degree murder on the first day of trial, February 9, 2011. The next day, at the conclusion of trial, a jury found him guilty as charged. Mr. Pleasant filed motions for post-verdict judgment of acquittal and new trial, which the court denied on March 11, 2011.[2] The court then sentenced Mr. Pleasant to life | ^imprisonment without benefit of parole. The court also granted his motion for appeal.

STATEMENT OF THE FACTS

Ms. Kovach was shot and killed during an armed robbery that occurred in the early morning hours of April 18, 2005. At trial, the parties stipulated to the results of an autopsy that showed that Ms. Kovach died of a single gunshot wound to the left side of her head. Stippling around the wound indicated that the shot that killed Ms. Kovach was fired within one to two feet of her head. The parties also stipulated to the authenticity of the 911 tape of the report of the shooting, which was played for the jury.
Stephanie Knight was with Ms. Kovach when she was killed. Ms. Knight was a friend and co-worker of Ms. Kovach. The two women had completed their shift at the Crescent City Brewhouse in the French Quarter in the late afternoon of the murder. Later, they had a few drinks at a bar in the French Quarter, and accompanied a friend to her house in Mid-City, where they ate dinner. They returned to the French Quarter later that evening, drank another beer, then went to catch a streetcar Uptown to Ms. Knight’s apartment. After waiting some time for the streetcar, they elected to take a cab instead.
Although Ms. Knight’s apartment was at the corner of Robert and Danneel Streets, the women left the cab at Robert Street and St. Charles Avenue sometime between 12:30 and 1:00 a.m., and walked to the apartment. They did this to give them time to smoke a cigarette. Ms. Knight testified that they each were carrying a lapurse and a beer bottle. She stated that as they neared her apartment, she stopped to light another cigarette and handed her purse to Ms. Kovach. At that moment, she noticed two men behind them. She stated that one of the men asked how to get to Tchoupitoulas Street. She turned to point back toward St. Charles, and then she heard a bottle break. She turned back and saw that Ms. Kovach was struggling with the other man, who was trying to take Ms. Knight’s purse. That man then shot Ms. Kovach in the head, and she fell to the ground. Ms. Knight testified that both *250 men ran away but the man who shot Ms. Kovach returned to rip Ms. Kovach’s purse off of her shoulder and then fled with his companion toward St. Charles Avenue. Ms. Knight stated that after the men fled, she went to Ms. Kovach to see if she was okay. After seeing that Ms. Kovach had been shot, Ms. Knight ran to her apartment to call 911 because her cell phone had died.
Ms. Knight indicated that the shooter of the two men was wearing a baggy white t-shirt, dark jeans, a bandana around his head, and “twists” in his hair. She described the other robber, who watched the struggle between Ms. Kovach and the shooter, as taller than the shooter, with a lighter complexion, and wearing dark pants and a dark shirt. Ms. Knight testified that she did not see the men get out of a vehicle prior to the robbery or enter a vehicle afterward.
Ms. Knight was presented with a photographic lineup from which she identified the man who shot Ms. Kovach. She stated that she was shown two other photographic lineups, but was unable to make an identification from one and wrongly identified someone else in the third one.
|4On cross-examination, Ms. Knight stated that she had consumed about five or six beers over the course of the evening, but she insisted that by the time of the shooting, she was not impaired. She reiterated that she only saw two robbers and no car connected to them. She did not see Mr. Pleasant at the scene. On redirect, Ms. Knight testified that she viewed the lineups one or two months after the murder. She was unable to identify anyone in the lineup that contained Mr. Pleasant or Ahmad Hill’s photograph. However, she positively identified Darnell Gilmore as the man who was struggling with and shot Ms. Kovach.
The State called Mr. Hill, who indicated that he would not testify. The court thus declared him a hostile witness. Mr. Hill stated that he knew Mr. Pleasant, but he initially refused to answer any other questions. After he testified that he did not remember making a statement to the police in April 2005, the State played the tape of this statement. In the statement, after being advised of his rights, Mr. Hill initially indicated that he wanted an attorney, and the detectives taking the statement concluded it at that point. The statement resumed half an hour later with the explanation that Mr. Hill meant that he wanted an attorney after giving his statement, and he stated that he wanted to tell the detectives what happened. He said that his agreement to give a statement was not the result of any force or promises, and that it was the product of his free will. The detectives again advised him of his rights via a waiver form that Mr. Hill initialed and signed. He also acknowledged that he had been advised of his rights earlier.
| ¡¡Mr. Hill told the officers that on the night of the shooting, he was riding his bicycle back from a party when he encountered Mr. Pleasant and Mr. Gilmore on Clara Street. Mr. Hill stated Mr. Pleasant left shortly thereafter and later pulled up in a burgundy Jeep. They told him that they were about to get some money by snatching purses, and they invited him to join them. The trio entered the Jeep, and they drove around until they passed two women walking on the street. Mr. Hill stated that Mr. Pleasant pulled the Jeep over to the side of the road. The trio exited the jeep, and Mr. Hill and Mr. Gilmore walked up to the two women. Mr. Hill stated that he and Mr. Gilmore walked up behind the women before accosting them, but he denied that either he or Mr. Gilmore asked the women for directions. Instead, Mr. Gilmore merely *251 told them to “give it up.” He stated that Mr. Pleasant remained back by the Jeep during the robbery because Mr. Pleasant walked with a severe limp. Mr. Hill stated that he was four feet from Mr. Gilmore and one of the women. He stated that Mr. Gilmore took the beer bottle that the woman was holding from her and hit her in the head with it. When that woman would not give up her purse, Mr. Gilmore shot her. He stated that Mr. Gilmore fired only once and then took the victim’s purse. The trio then ran back to the Jeep; entered it, and Mr. Pleasant drove away from the scene. Mr. Hill stated that Mr. Gilmore did not answer when he asked him why he shot the woman. Mr. Hill said that he then told Mr. Pleasant to take him home, and Mr. Pleasant complied.
Mr. Hill insisted that he only saw one purse, and he saw Mr. Gilmore remove money from the purse, but Mr. Hill did not receive any of the money. He | (¡admitted that he may have touched the purse when Mr. Gilmore threw it to him. Mr. Hill stated that he was wearing blue jeans and a white t-shirt during the incident. Mr. Pleasant was wearing blue jeans, a black shirt, and a hat. Mr. Gilmore was dressed all in black, with a blue bandana tied at the back.
Mr. Hill stated that he saw Mr. Gilmore playing with the gun inside the Jeep before the robbery. After entering the Jeep, Mr. Hill saw the broken steering column and surmised that the Jeep had been stolen. He stated that the Jeep was parked not far away from the robbery. Mr. Hill insisted that he got out of the Jeep and followed Mr. Gilmore up to the women only to see what Mr. Gilmore was going to do. He denied acting as a lookout during the robbery, and he maintained that he thought Mr. Gilmore was only going to scare the women in order to rob them. He stated that Mr. Pleasant sped away from the scene, running several stop signs in his attempt to get away. Mr. Hill denied speaking with Mr. Pleasant or Mr. Gilmore since the robbery, and he insisted that he did not go to the police because he was afraid they would kill him.
After the State played the tape of Mr. Hill’s statement, Mr. Hill admitted that it was his voice on the tape but maintained that he did not remember what he had told the detectives. He insisted that when he asked for a lawyer at the beginning of the tape, the detectives shut off the tape, beat him, and then restarted the tape when he agreed to say what they told him to say. He also stated that he testified before the grand jury in this case. Mr. Hill admitted that he remembered seeing Mr. Gilmore and Mr. Pleasant in the Jeep that night and thought he remembered Mr. |7Pleasant saying, “Let’s go get some purses.” He also remembered that Mr. Pleasant was driving that night, but he did not recall if Mr. Gilmore had a gun. Mr. Hill insisted that he was not armed. Mr. Hill stated that although he remembered Mr. Pleasant pulling up behind the women, who were walking down the street, he did not remember approaching the women, seeing a woman get shot, or re-entering the Jeep with the women’s purses.
On cross-examination, Mr. Hill insisted that although he asked for an attorney before giving his statement to the police, none was provided to him. He denied that Mr. Pleasant shot the woman, and he denied seeing Mr. Pleasant with a gun. He stated that Mr. Pleasant did not walk up to the women with him and Mr. Gilmore, and he denied that Mr. Pleasant mentioned that they were going to steal any purses. He also insisted that he did not know what Mr. Gilmore intended to do when they exited the Jeep. He admitted that he knew that the Jeep was stolen. He stated that the trio were smoking marijuana in the *252 Jeep and had planned to use the Jeep to steal another vehicle. He insisted that no one mentioned stealing any purses. On redirect, Mr. Hill stated that he did not recall if the events happened as he recounted in his statement. He claimed that his statement contained lies that the detectives made him say.
David Pipes, the prosecutor who called Mr. Hill before the grand jury to testify in connection with the murder, was called as a witness by the State. Mr. Pipes testified that he played Mr. Hill’s statement for the grand jury. Mr. Pipes stated that he asked Mr. Hill if he had a chance to review the statement and if he [^wished to add or change any of the statement. Citing the secrecy of grand jury testimony, Mr. Pipes refused to say what Mr. Hill’s answer was. The court upheld this refusal.
New Orleans Police Department Sergeant Joseph Catalanotto testified that he formerly supervised the detectives in the Homicide Division. He testified that Detective Michael Guillory was the lead investigator in the case, but he died prior to trial. Sergeant Catalanotto testified that he personally visited the scene of the shooting on the night it occurred, and he noticed that the lighting was excellent due to a light on a nearby utility pole. He spoke with Ms. Knight and obtained descriptions of the two men who accosted her and Ms. Kovach: one was an African-American male, 5'7" to 5'8", stocky, wearing dark baggy pants, as well as a bandana tied around his head with little dreadlocks and his face exposed; the other one was taller, thinner, and was wearing dark clothing. Sergeant Catalanotto arrested Mr. Gilmore, whom he stated was the shorter of the two men, as well as Mr. Hill, whom he stated was the taller of the two men. Officers recovered the Jeep at a body shop; inside the Jeep, they found items belonging to Ms. Kovach and Ms. Knight.
Sergeant Catalanotto testified that he met with Mr. Pleasant on the afternoon of April 25, 2005, a week after the murder, at the Second District station. He interviewed Mr. Pleasant after advising him of his Miranda rights from a form that Mr. Pleasant initialed and signed. When Mr. Pleasant denied being in the Jeep, Sergeant Catalanotto asked him if he was sure that his fingerprints would not be [9found in the Jeep. At that point, Mr. Pleasant agreed to tell them what happened on the night of the shooting. The detectives transported Mr. Pleasant to the Homicide Office. There they re-advised him of his rights, had him sign a waiver form, and then recorded his statement that evening.
At trial, the State played the statement, which actually consisted of two separate statements. In the first statement, which lasted for approximately half an hour, the officers advised Mr. Pleasant of his rights and informed him that he was under arrest for first degree murder. He initialed and signed a waiver form before making the statement. He stated that he was seventeen years old, and he had known Mr. Gilmore for most of his life. He further stated that he had known the other person involved for only a few months. He did not know the other person’s name; he referred to the other person as “Lil Red”. Mr. Pleasant stated that on the evening before the murder, he and Mr. Gilmore were together in a Jeep that Mr. Pleasant claimed “Lil Red” had stolen. At some point (there was some confusion on timing), they picked up “Lil Red”. The trio rode around in the stolen Jeep looking for other vehicles to steal. Mr. Pleasant stated that they spotted the two women as they were crossing the street, and “Lil Red” told him to pull around and park. He did so, and Mr. Gilmore and “Lil Red” *253 got out of the Jeep and approached the women. Mr. Pleasant stated that he remained in the Jeep, but he watched the events through the back window and the side mirror. Mr. Pleasant stated that while Mr. Gilmore stood to one side, “Lil Red” struggled with one of the women over her purse. Mr. Pleasant said that “Lil Red” then shot the woman, |inand he saw the woman fall. “Lil Red” and Mr. Gilmore ran back to the Jeep and entered it. Mr. Pleasant admitted that he heard the gunshot and saw the flash from the gun. He stated that “Lil Red” had a gun in his hand. When he asked “Lil Red” why he shot the woman, “Lil Red” replied that he did so because she did not want to give up her purse. Mr. Pleasant insisted that he saw only one purse, which “Lil Red” was carrying. “Lil Red” then went through the purse while Mr. Pleasant sped away from the scene. Mr. Pleasant stated that “Lil Red” found forty-five dollars and a bag of marijuana in the purse, and he gave Mr. Gilmore twenty dollars from the purse and Mr. Pleasant five dollars.
Mr. Pleasant insisted that he and Mr. Gilmore got out of the Jeep when they reached Freret Street, and “Lil Red” drove off in the Jeep. Mr. Pleasant stated that he went to his sister’s house on Valence Street, where he lived, and changed his clothes. He admitted that he lied when he earlier told the detectives that he had thrown away his clothes. He stated that he was wearing black jeans and a black t-shirt. He described Mr. Gilmore’s clothing as black jeans and a black shirt, and he had his hair in short “twists.” He described “Lil Red’s” clothing as a white t-shirt, dark jeans, and a bandana.
Mr. Pleasant stated that “Lil Red” told him that he had shot the woman in the leg, but he found out later that morning that she had been shot in the head and killed. Mr. Pleasant acknowledged that before giving his statement, the detectives had shown him a photographic lineup from which he chose Mr. Gilmore’s picture. |nHe insisted that although Mr. Gilmore approached the women with “Lil Red”, Mr. Gilmore was not the person who shot the woman.
Mr. Pleasant gave his second statement approximately an hour later. The detectives again advised him of his rights, which he waived. In the second statement, Mr. Pleasant said that Mr. Gilmore and “Lil Red” returned to the Jeep with two purses. He stated that “Lil Red” got into the front passenger seat, while Mr. Gilmore got in the rear passenger seat. Mr. Pleasant stated that “Lil Red” passed one of the purses to Mr. Gilmore, and the two men went through the purses. He did not see either man bleeding that night. When he saw “Lil Red” the next afternoon, his left index finger was bandaged.
Mr. Pleasant admitted that he told his sister the next morning that he might be in trouble. Later, his little sister told him that she had heard that the woman died. His sister then put him out of her house. Since then, he had been staying in the downstairs of an abandoned house. He also admitted that as soon as he and Mr. Gilmore got to his house after the shooting, Mr. Gilmore told him that “Lil Red” shot the woman in the head. Mr. Pleasant concluded the statement by saying that he made the statement because he was promised “his life” if he told the truth.
After the State played the tapes, Sergeant Catalanotto identified “Lil Red” as Mr. Hill. He stated that he also took statements from Mr. Hill and Mr. Gilmore, and he denied that Mr. Hill was beaten. With respect to Mr. Hill’s statement, Sergeant Catalanotto testified that he stopped the statement when Mr. Hill indicated that he wanted a lawyer. However, as he was completing the paperwork to book l^Mr. *254 Hill, Mr. Hill told him that he wanted to tell him what happened because he did not shoot the woman. Sergeant Catalanotto reminded him that he said he wanted a lawyer, and Mr. Hill responded that he meant that he wanted one for trial. The officer then asked Mr. Hill if he wanted to give a statement, and Mr. Hill said yes. He then took Mr. Hill’s statement.
Sergeant Catalanotto testified that he and Detective Guillory flew to Maryland a month after the shooting to present Ms. Knight with three photographic lineups. From one of the lineups, Ms. Knight chose Mr. Gilmore as the man who shot Ms. Kovach, but she was unable to make identifications from the other two lineups containing photographs of Mr. Hill and Mr. Pleasant.
On cross-examination, Sergeant Catala-notto admitted that there was no indication that Mr. Pleasant approached the two women, and Mr. Hill never stated that Mr. Pleasant had a gun that night. He admitted that he did not record Mr. Pleasant’s interview at the Second District because it was a “pre-interview.” He stated that part of the time delay between this interview and the statements at the Homicide Office was due to compiling the lineup while at the Second District and then securing a room and recording equipment at the Homicide Office. He insisted that no one spoke with Mr. Pleasant from the time he left the Second District until he gave his statements. He admitted that Mr. Pleasant maintained that the men were out that night looking for vehicles to steal, and his investigation showed that either Mr. Hill or Gilmore shot Ms. Kovach.
| i3The sole defense witness was Mr. Pleasant. He testified that when he was detained by the police he was told that he would “go down” for first degree murder and get the death penalty unless he told them the truth of what happened that night. He was further told that if he cooperated he would not be charged and would be allowed to leave. He admitted that on the night of the shooting, he was in the Jeep with the other men, smoking marijuana and planning to steal more vehicles. He denied that there was any talk of stealing purses or robbing anyone. He admitted that the other men gave him five dollars, which he took because he had no place to stay and was hustling out of a crack house. He insisted that he did not know what Mr. Hill and Gilmore were going to do when they exited the Jeep. He thought that they were going to steal another car. He maintained that he did not see where they went. He stated that he took off in the Jeep when they ran back to the Jeep. He insisted that he was afraid to call the police because he had had a juvenile charge dealing with a stolen car that had been dropped. He denied having a gun on the night of the shooting. He also denied shooting Ms. Kovach or trying to take anything from Ms. Knight.
On cross-examination, Mr. Pleasant acknowledged driving the Jeep that night, which he had stolen, and that he received five dollars from the robbery. He denied seeing the two women. He told the detectives that he had parked at the corner. He stated that the detectives continued questioning him over and over, telling him that they had only picked him up to find out what happened that night and that they would not charge him with murder. He stated that he told them the | l4truth at the Second District, but by the time he gave his statements at the Homicide Office, the story had evolved to include information that the detectives wanted him to say. He estimated that his statement contained sixty percent truth; the remainder was what they told him to say. He stated that he did not see the shooting, only heard a “pop,” and did not see the victim *255 drop. He insisted that the detectives wanted him to say that he saw Mr. Gilmore shoot the victim, but he told them that “Lil Red” did so. He stated that until he gave his statement, the detectives were unaware of “Lil Red’s” involvement in the murder. He reiterated that Mr. Hill was present and was the person with the gun. He stated that he stopped the Jeep near a Chrysler that he thought the other two men were going to steal, and the men must have seen the women when they got out of the Jeep. However, because the detectives did not want to hear about the Chrysler, he told them what they wanted to hear.
Mr. Pleasant denied staying at his sister’s house at the time. He testified that he merely kept some clothing there and showered there. He testified that he did not mention in his statement that he stayed at a crack house because he did not want the police to investigate the woman who ran the house. He also stated that he had seen Mr. Hill with guns before that night. He denied that he and Mr. Gilmore told Mr. Hill that they were going to steal purses; instead, they told him that they were going to steal cars. He denied seeing the victims, insisting that he only said in the statement that he did so because the detectives wanted him to say so. He reiterated that he repeated the detectives’ version because they told him he was | iSonIy a witness and would not be charged if he gave a statement. On redirect, he stated that the police held him for approximately eleven hours before he finished giving his statements. He insisted that the detectives picked him up on Freret Street and that they did not place handcuffs on him when they took him to the Second District station. He testified that they did not tape their questioning of him there. He maintained that he believed he would not be charged and would be allowed to go home.
On rebuttal, the State called Sergeant Catalanotto, who denied giving Mr. Pleasant any information to include in his statements. He denied telling Mr. Pleasant what to say because no one had been identified at that point, and Mr. Pleasant was the first suspect to be interviewed. He denied stopping, restarting, or editing the tapes made of the statements. On cross-examination, Sergeant Catalanotto stated that he had received a tip the day after the murder implicating someone named “Donell.” The police brought in Gilmore for questioning, but he was released because there was not enough information to place him under arrest. He stated that he learned of Mr. Hill after Mr. Pleasant gave his statements.

DISCUSSION

Errors Patent

A review of the record reveals three patent errors. First, there is no indication that Mr. Pleasant waived the mandatory twenty-four-hour delay between the denial of his motion for new trial and his sentencing, as provided by La. C.CrJP. art. 878. However, as per State v. Collins, 584 So.2d 356, 359 (La.App. 4th Cir.1991), the failure to observe the twenty-four-hour delay mandated by La. C.Cr.P. art. 873 is harmless when the defendant does not complain of his sentence on appeal. See also State v. Riley, 05-1311, p. 4 (La.App. 4 Cir. 9/20/06), 941 So.2d 618, 621; State v. Wheeler, 04-0953, p. 9 (La.App. 4 Cir. 3/9/05), 899 So.2d 84, 89. Here, Mr. Pleasant does not complain of his sentence, which was mandatory. Thus, this error is harmless.
In addition, when imposing the sentence, the trial court failed to order that the sentence be served without benefit of probation or suspension of sentence as *256 mandated by La. R.S. 14:30.1; the court only ordered that it be served without parole eligibility. However, in instances where these restrictions are not recited at sentencing, La. R.S. 15:301.1(A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the sentencing court. State v. Williams, 00-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. Further, La. R.S. 15:301.1(A) self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute. Id. Thus, there is no need for this court to correct the sentence. See State v. Phillips, 03-0304, pp. 2-3 (La.App. 4 Cir. 7/23/03), 853 So.2d 675, 677.
Finally, the trial court granted the motion for appeal before sentencing Mr. Pleasant. Although an appeal may be taken only from a conviction and sentence, this court has held that it is not necessary to dismiss an appeal taken after 117conviction but before sentencing because “[dismissing the appeal would simply result in a delay of the appellate process and hinder defendant’s right to appeal.” State v. Martin, 483 So.2d 1223, 1225 (La.App. 4th Cir.1986). See also State v. Thompson, 98-0988, p. 3 (La.App. 4 Cir. 1/26/00), 752 So.2d 293, 295. This error is also harmless.
There are no other errors patent.

Assignment of Error

By his sole assignment of error, Mr. Pleasant contends that the evidence adduced at trial was insufficient to support the jury’s verdict that he was guilty of second degree murder. Specifically, he asserts that the evidence did not show beyond a reasonable doubt that he was a principal to the underlying armed robbery of Ms. Kovach and Ms. Knight.
In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which states that the court must determine whether the evidence, viewed in the light most favorable to the prosecution “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). See also State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18; State v. Batiste, 06-0875, p. 7 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 814; State v. Sykes, 04-1199, 04-0947, p. 6 (La.App. 4 Cir. 3/9/05), 900 So.2d 156, 161. In addition, when the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. | iS15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657.
Mr. Pleasant was convicted of second degree murder, which is defined by La. R.S. 14:30.1, in pertinent part, as “the killing of a human being: ... (2) When the offender is engaged in the perpetration ... of ... armed robbery ... even though he has no intent to kill or inflict great bodily harm.” La. R.S. 14:64 defines armed robbery as “the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon.” La. R.S. 14:24 provides that principals to a crime are those who are “concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly coun *257 sel or procure another to commit the crime.” In order to be convicted as a principal, the State must show that a defendant has the requisite mental intent to commit the crime. See State v. Newman, 03-1721, p. 13 (La.App. 4 Cir. 7/7/04), 879 So.2d 870, 878; State v. Harney, 01-2336, p. 7 (La.App. 4 Cir. 6/26/02), 823 So.2d 987, 993. Although factors that can contribute to the finding that a defendant is a principal include “ ‘standing by the scene of the crime ready to give some aid if needed, it is necessary that the principal actually be aware of the accomplice’s intention.’ ” State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (quoting from 2 W. LaFave, A. Scott, Substantive Criminal Law, § 6.7, p. 138 (West 1996)).
 Although, Mr. Pleasant was originally charged with first degree murder, which would have required a showing of the specific intent to kill or inflict great bodily harm, the State amended the bill to charge him with second degree murder. In order to support the charge, the State was only required to show that Mr. Pleasant was engaged in the perpetration of an armed robbery during which the victim was killed. Armed robbery is a general intent crime, and “[i]n general intent crimes, the criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal.” State v. Arnold, 07-0362, p. 7 (La.App. 1 Cir. 9/19/07), 970 So.2d 1067, 1071-72; see also State v. Magee, 05-171, p. 5 (La.App. 5 Cir. 10/6/05), 916 So.2d 1178, 1183; State v. Tolliver, 35,930, p. 7 (La.App. 2 Cir. 5/8/02), 818 So.2d 310, 315.
Mr. Pleasant points to his own testimony and to his statement, as well as the testimony of Mr. Hill, to show that the State did not prove that he intended to participate in the armed robbery that led to Ms. Kovach’s death. He asserts that he was riding around in the Jeep that night with Mr. Hill and Mr. Gilmore intending to steal cars, not to commit an armed robbery. He acknowledges that Mr. Hill indicated in his statement that Mr. Pleasant and Mr. Gilmore told him while they were riding around that they intended to steal some purses, but he points to Mr. Hill’s testimony indicating that this statement was false.
|20In his statement Mr. Hill said that when he joined Mr. Gilmore and Mr. Pleasant, they told him that “they were gonna go ... uh, get some money and snatch some purses ... gonna rob somebody.” He also stated that when he got in the Jeep, Mr. Gilmore got in the front passenger seat, and Mr. Gilmore had a gun in his hand. He stated that after passing the two victims, Mr. Pleasant pulled the Jeep over so that Mr. Gilmore and Mr. Hill could exit and go to the women.
During his testimony, Mr. Hill maintained that he did not remember what he told the police, did remember being in the Jeep, but did not remember getting out of the Jeep with Mr. Gilmore or seeing the victim get shot. He first testified that he thought he remembered Mr. Pleasant and Mr. Gilmore telling him that they were going to steal some purses. He also testified that he thought he remembered Mr. Pleasant pulling over behind the victims, who were walking in the street. When the prosecutor asked him: “But you do remember them saying let’s get some purses?” Mr. Hill replied: “I think so.” However, on cross-examination, after defense counsel pointed out that his testimony, that he did not know that Mr. Gilmore intended to rob the victim when he followed him out of the Jeep, did not make sense if the other two men told him of their intent to steal purses. Mr. Hill agreed that neither man mentioned that the men were going to steal some purses. On redirect, Mr. Hill then stated that the *258 other men did not tell him that they intended to steal purses. He insisted that the detectives forced him to lie in his statement to his “benefit.”
|21In both his statement and his testimony, Mr. Pleasant insisted that he and the other two men were riding around that night, intending to steal other cars. He indicated in his statement that Mr. Hill told him to pull over after they had passed by the victims, although at trial he maintained that he did not see the victims and could not see them from where he pulled over. He testified that he heard a pop, and then the other two men got into the Jeep. He sped away when Mr. Hill told him that he had shot the victim because she would not give up her purse. He insisted that any discrepancies between his testimony and his statement were due to the detectives forcing him to say what they wanted him to say. Nonetheless, he admitted that he accepted some money from the victim’s purse, albeit only five dollars.
Both on direct testimony and on rebuttal, Sergeant Catalanotto testified that Mr. Pleasant and Mr. Hill were not forced to give their statements. He denied feeding Mr. Pleasant any information to put in his statements. However, Mr. Pleasant insisted that the detectives kept stopping the recording of his statements.
In support of his assignment of error, Mr. Pleasant cites State v. Mussall, 523 So.2d 1305 (La.1988), but the Mussall case is distinguishable from the instant case. In Mussall, the victim testified that he was robbed by the defendant, but his testimony was very unpersuasive, considering there were no other witnesses to the armed robbery that purportedly happened in the French Quarter in broad daylight and the state did not introduce any additional evidence to corroborate with the victim’s testimony. Id. at 1307, 1311-12. However, the defendant in Mussall | ^insisted that the victim brought the robbery charge against him out of revenge to recover money that he believed the defendant had wrongfully taken from him. Id. at 1307. In upholding this Court’s reversal of the defendant’s conviction, the Louisiana Supreme Court in Mussall noted:
If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally. The actual trier of fact’s rational credibility calls, evidence weighing and inference drawing are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution, (footnote omitted) and by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt, (footnote omitted) Thus, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence, (footnote omitted) ... “the court is not to substitute its judgment of what the verdict should be for that of the jury, but that at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.”
(Emphasis supplied). Id. at 1311.
In the instant case, by contrast, the version of the robbery and murder presented to the jury through Mr. Hill’s statement was not improbable. Basically, the jury was left with contradictory evidence as to whether Mr. Pleasant knew when he stopped the Jeep that Mr. Gilmore and Mr. Hill intended to rob the victims when they exited. The jury chose to believe Mr. *259 Hill’s statement rather than Mr. Pleasant’s statement, or his or Mr. Hill’s testimony. A fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 09-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 211; State v. Huckabay, 00-1082, p. 33 (La.App. 41 Cir. 2/6/02), 809 So.2d 1093, 1111. The jury was able to view the demeanor of Mr. Hill and Mr. Pleasant. The jury apparently found Mr. Hill’s statement more persuasive than his testimony, which showed that he was unwilling to testify against Mr. Pleasant and downplayed his own participation in the incident. There is nothing in the record before this court or in the testimony presented at trial that shows that the jury abused its discretion in crediting Mr. Hill’s statement over his trial testimony or that of Mr. Pleasant.
Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that Mr. Pleasant was a principal to the armed robbery that led to the victim’s death. Thus, the evidence supports the jury’s verdict of guilty of the second degree murder of Alissa Kovach beyond a reasonable doubt. This assignment has no merit.

DECREE

Accordingly, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. The indictment also charged Ahmad Hill and Darnell Gilmore with first degree murder. The State eventually amended the bill to charge both men with second degree murder. Mr. Hill elected a judge trial and was acquitted. Mr. Gilmore was convicted by a jury of second degree murder. Mr. Gilmore's appeal, 2011-KA-1606, is currently pending in this Court.

. The minute entry indicates that Mr. Pleasant's motions for post-verdict judgment of acquittal and new trial were denied on March 25, 2011, but the transcript reveals that it was on March 11, 2011. Where there is a conflict between the transcript and minute entry, the transcript prevails. State v. Jones, 557 So.2d 352, 354 (La.App. 4th Cir.1990).