PAUL A. BONIN, Judge.
| TA less-than-unanimous jury found Timothy Smith guilty of the attempted manslaughter of Quinn Bourgeois. See La. R.S. 14:27, 14:31. Attempted manslaughter is a verdict responsive to the charged offense of attempted second degree murder. See La. C.Cr.P. art. 814 A(4); see also La. R.S. 14:30.1. The district court sentenced Mr. Smith to seventeen years imprisonment at hard labor[1] and denied Mr. Smith’s motion to reconsider the sentence. See La.C.Cr.P. art. 881.1.
Mr. Smith appeals his conviction and sentence. See La.C.Cr.P. art. 912 C(l); La.C.Cr.P. art. 881.2 A. He assigns several errors. He argues that the evidence is insufficient to support a guilty verdict under the well-known Jackson v. Virginia standard. Related to that argument are the assignments that the State failed to disprove self-defense and that the evidence supports a guilty verdict only [ ?for the offense of aggravated battery,[2] another *380 verdict responsive to the offense of attempted second degree murder.
Mr. Smith further argues that he was entitled to a mistrial as a result of several rulings by the trial judge. The first of these rulings is that the trial judge did not permit him to exercise his peremptory challenges through a back-striking procedure. The next rulings challenged relate to statements made during the trial testimony of police witnesses that referenced other crimes Mr. Smith committed, and the prosecutor’s remark during his cross-examination that Mr. Smith had “law-yered-up.” Mr. Smith argues that'the trial judge erred in failing to grant him a new trial “in the interests of justice.”
Mr. Smith also argues that the sentence imposed is excessive. In addition to these assigned errors, see La.C.Cr.P. art. 920(1), he specifically requests that we conduct an error patent review, which we do irrespective of such a request from a defendant. See La.C.Cr.P. art. 920(2).
After a Jackson v. Virginia review, we reject Mr. Smith’s argument that the prosecution failed to present to the jury sufficient evidence to prove beyond a reasonable doubt all the essential elements of the crime of attempted manslaughter and, consequently, reject his argument that the jury could convict him of only aggravated battery on this evidence. We address these findings in Part I, post With respect to his motion for new trial based on back-striking complaints, we conclude that Mr. Smith failed to properly preserve this alleged error for our | .¡review and more fully explain our holding in Part II, post. In Part III, post, we address our review of the trial court’s rulings on the various motions for mistrial and conclude that in each instance there is no reversible error. Finally, in Part IV, post, we address why we find that the sentence imposed by the district judge was within her discretion and did not exceed the constitutional limit for the sentence of this offender for this offense.
We, thus, affirm both the conviction and sentence.[3]
I
In this Part we first address the constitutional standard of review for claims of insufficiency of evidence and then turn to consider the evidence presented to the jury as the fact-finder. Finally, we explain why we find from the record that there was sufficient evidence to prove beyond a reasonable doubt every element of the offense of manslaughter and, in this case, that Mr. Smith’s killing of Mr. Bourgeois was not justified.
A[4]
The standard of review for sufficiency of evidence applicable to criminal convictions in state courts is set out in Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). “After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine *381 whether the record evidence | ¿could reasonably support a finding of guilt beyond a reasonable doubt.” Id. “But this inquiry does not require a court to ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ ” Id. quoting Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (emphasis added by Jackson). “Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (bold emphasis in original); see also Johnson v. Louisiana, 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), (stating: “Jury verdicts finding guilty beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt”).
In discharging our review function, we consider “all of the evidence ” before the actual fact-finder. Jackson, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). The United States Supreme Court has explained that the standard of review for sufficiency of evidence is highly deferential to the fact-finder because it “gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Id. “The criterion thus impinges upon ‘jury’ discretion only to the extent necessary to guarantee the fundamental protection of due process of law.” Id.
Similarly, “[a] reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review.” State v. Macon, 2006-0481, p. 8 (La.6/1/07), 957 So.2d 1280, 1285-1286. “It is Rnot the function of an appellate court to assess credibility or re-weigh the evidence.” Id. The Due Process Clause of the Fourteenth Amendment, the source of the Jackson standard, does not countenance, much less require, that we re-weigh testimony and witness credibility. And “[i]n criminal eases [a court of appeal’s] appellate jurisdiction extends only to questions of law.” La. Const. art. V, § 10(B). See also State v. Barthelemy, 09-0391, p. 24 (La.App. 4 Cir. 2/24/10), 32 So.3d 999, 1015.
Therefore, in discharging our review function for sufficiency of evidence, we cannot re-weigh or re-consider reasonable inferences drawn from basic facts to ultimate facts. We must confine ourselves to questions of law except to the extent, and only to the extent, that Jackson mandates otherwise. See State v. Gilmore, 10-0059, p. 5 (La.App. 4 Cir. 10/6/10), 50 So.3d 208, 212.
B
The crime of manslaughter is “a homicide which would be murder ... under Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(1).[5] *382 Second-degree murder is defined as “the killing of a human being ... when the offender has the specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1 A(1). “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; they are merely mitigating factors lessening the culpability of a defendant. See State v. Lombard, 486 So.2d 106, 110 (La.1986). Therefore, because provocation is not an element of manslaughter, in our review function in this case, we need not consider whether there is any evidence of Mr. Smith’s provocation and need only focus on whether there was an intentional killing. See Moore, supra, 11-0025, p. 7, 75 So.3d at 26-27.
An attempt to commit any crime is a specific intent crime. See La. R.S. 14:27 A. “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Accident is, of course, the anti-thesis of specific intent. A finding that a shooting was accidental would preclude a finding of the essential element of specific intent. See State v. Matthews, 380 So.2d 43, 45 (La.1980).
C
We turn now to a consideration of the record facts.
The jury had no less than three principal sources of information about the circumstances of the shooting of Mr. Bourgeois: the testimony of Mr. Bourgeois himself; the statements by Tonic Smith, the estranged wife of the defendant and the girlfriend of Mr. Bourgeois, that she made to the 911 operator and to police investigators; and the testimony of Mr. Smith. All three admit to being the only |7ones present at the shooting. With respect to each principal source, there was evidence from other sources which corroborates and contradicts each.
Before reviewing the conflicting versions — and they are conflicting — of the three principal sources, we summarize some basically undisputed background facts important to understanding and evaluating the different versions. Mr. and Mrs. Smith, although married, had been estranged for some time before the shooting of Mr. Bourgeois. Mr. Smith was residing in Atlanta. Mrs. Smith was residing with their son in an apartment in New Orleans East. Mr. Bourgeois and Mrs. Smith were romantically involved, and, although not co-habiting, they often stayed overnight at each other’s homes.
On Christmas Day of 2008, Mr. Smith had returned to New Orleans and spent the day with his family. Mrs. Smith and Mr. Bourgeois spent Christmas Day with Mr. Bourgeois’ family. During the day and through the evening, Mrs. Smith called Mr. Smith and talked with him about their prospects of reuniting. They may have, either very late that night or early the next morning, met in Mrs. Smith’s truck but soon argued, and Mr. Smith on his own made his way to Mrs. Smith’s apartment.
Mr. Smith later entered Mrs. Smith’s apartment and vandalized its contents, including those in their son’s bedroom. He found a picture of Mrs. Smith and Mr. Bourgeois, which he defaced and wrote on the back “F — k you, by Tim.” He posted it to the front door of the apartment such that it would be visible upon ^approach. Mrs. Smith and Mr. Bourgeois arrived at her apartment complex in separate vehicles at about the same time. At this point, the versions diverge.
*383 1
Mr. Bourgeois testified that he left the Christmas party at the same time as Mrs. Smith, and he pulled into the parking lot of the complex just after she did. She was already out of her truck and walking toward the courtyard area. He did not observe her with her gun, which he knew she routinely kept under her mattress; he had never known her to have her gun in her truck. He believes that if she were holding her gun, he would have seen it. According to Mr. Bourgeois, Mr. Smith attacked Mrs. Smith, she fell to the ground, and Mr. Smith fired one shot at her head. She was not hit by the shot. After the shot was fired, Mr. Bourgeois exited his car . to come to the assistance of Mrs. Smith. Mr. Bourgeois approached Mr. Smith and “told him be cool; it’s Christmas.” Mr. Bourgeois, however, never made it close enough to physically break up the fight because Mr. Smith began to shoot at him from a distance. Mr. Bourgeois tried to protect himself by putting his hands in front of himself.
Mr. Bourgeois was profusely bleeding when the police and paramedics arrived. He was unable to answer the questions by police on the scene because he was trying to conserve his energy.
Mr. Bourgeois was shot nine times by the same firearm. According to the emergency room physician, who was familiar with gunshot wounds and directly [ 3observed Mr. Bourgeois’ injuries, at no time was Mr. Bourgeois physically close to or in contact with the weapon that shot him.
Two or three weeks after the incident and after receiving life-saving surgery, Mr. Bourgeois was able to meet with the Detective Thomas in the hospital and identified Mr. Smith from a photographic line-up as the person who shot him. Mr. Bourgeois also identified Mr. Smith in the courtroom as the person who shot him. He testified that Mr. Smith shot directly at him. Mr. Bourgeois was unarmed at all times.
2
Mrs. Smith did not testify at the trial. She had, however, telephoned the emergency 911 operator. The tape of that call was played to the jury and introduced into evidence. She also made several statements to the investigating officers. These statements were disclosed to the jury without objection.
In her 911 call, she reported that her boyfriend had been shot and that he was the only one hit in the shooting. When asked where he had been shot, she replied, “All over, all over. I can’t really tell, I can’t really tell.” After EMS was on its way, Mrs. Smith elaborated on where her boyfriend had been shot; he had been shot in his hand, “in his stomach, and all in his chest.” She stated that she and her boyfriend had just arrived home, and her boyfriend was shot outside their apartment. But she also reported to the 911 operator that she did not know who had shot him, did not know in which direction the shooter or shooters had fled, and had no idea whether he was shot by mistake.
|10In her initial statement to investigators, she told the police that she saw the shooter. But she described him only as a black man wearing a white shirt and blue jeans. She did not tell the police that she knew him.
After the police were able to further investigate and had discovered the defaced photograph, they approached Mrs. Smith at the hospital and asked whether she knew anyone named “Tim.” She answered that the only person she knew by that name was her estranged husband. But, notably, she still did not tell the police that her husband, Mr. Smith, was the shooter.
*384 3
Mr. Smith, the defendant, also testified at trial. When he saw a picture of Mrs. Smith with Mr. Bourgeois, Mr. Smith became so enraged that he wrecked the apartment. After vandalizing the apartment and posting the defaced photograph of the couple on the door, he heard Mrs. Smith arriving. Contrary to Mr. Bourgeois’ testimony, she and Mr. Bourgeois walked towards the apartment together, and she was armed with her gun. Mr. Bourgeois was unarmed. As he exited the apartment, Mrs. Smith pointed her gun at him. While Mrs. Smith was momentarily distracted, Mr. Smith jumped her, and the three individuals tussled for the weapon. During the ensuing struggle, the gun accidentally discharged and hit Mr. Bourgeois.
When he heard the gunshots, Mr. Smith became frightened and fled. Several days later, he learned that there was a judicial warrant for his arrest, and he surrendered to the police in the company of his attorney. He made no pre-trial statements to the investigating officers. He said that he did not intend to shoot or Inharm anyone, and he said that he had no animus toward Mr. Bourgeois. The defendant did not call 911 because he did not think anyone had been injured. He further stated that he had in 2008 pled guilty to charges of possession of cocaine and marijuana.
D
Mr. Smith assigns specifically as error, regarding the insufficiency of the evidence, that the State did not disprove his assertion of self-defense. The State bears the burden of proving that Mr. Smith’s shooting of Mr. Bourgeois was not justified. See State v. Lynch, 436 So.2d 567, 569 (La.1983).
In non-homicide cases, “[t]he use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person ... provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.” La. R.S. 14:19 A. Importantly, however, the self-defense justification is not available to “[a] person who is the aggressor or who brings on a difficulty ... unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.” La. R.S. 14:21.
In State v. Bates, 95-1513, p. 9 (La.App. 1 Cir. 11/8/96), 683 So.2d 1370, 1375-1376, a ease cited by Mr. Smith, the defendant testified that his wife, wielding two kitchen knives, one in each hand, tried to kill him and successfully stabbed him in the stomach. The defendant disarmed his wife and killed her during the struggle. See id., p. 11, 683 So.2d at 1376. Other evidence from the autopsy | ^report, however, showed that the victim had been stabbed sixteen times, including defensive wounds on her hands. See id, p. 9, 683 So.2d at 1376. The trial court convicted the defendant of second degree murder, and the appellate court affirmed the conviction, after noting that the state must prove that the defendant did not act in self-defense. Similarly to Bates, sufficient evidence exists to prove that Mr. Smith did not act in self-defense. The testimony of Mr. Bourgeois, of the doctor who treated him, and of the investigating officers corroborate one another and show that Mr. Bourgeois was shot nine times by a single firearm. Furthermore, Mr. Smith’s treating surgeon, who had seen many gunshot wounds before, testified that Mr. Smith was nowhere near the firearm when it discharged, contradicting Mr. Smith’s account that the weapon discharged accidentally while the two men were struggling over it. Taking into account the fact that Mr. *385 Bourgeois received defensive wounds to his hand, the fact that Mr. Bourgeois was shot from a distance, and the fact that Mr. Bourgeois was unarmed at all times, a reasonable fact-finder could find beyond a reasonable doubt that Mr. Smith did not act in self-defense when he killed Mr. Bourgeois, and thus the killing was not justified.
II
In this Part we address Mr. Smith’s back-striking complaint and conclude that Mr. Smith failed to properly preserve this alleged error for our review.
At the outset we observe that Mr. Smith was correct in objecting to the trial court’s refusal to allow back-striking. The statutory right to exercise peremptory challenges at any time before the jury panel is sworn has long been recognized. See State v. Watts, 579 So.2d 931 (La.1991); see also La.C.Cr.P. arts. 788, 790, and 795 B(1). Moreover, La.C.Cr.P. art. 799.1, added in 2006, codifies the Watts holding.[6] Despite the long-standing recognition of this right and- intervening legislative action, some trial courts have continued to restrict a party’s exercise of the statutory right to peremptory challenges. See, e.g., State v. Lewis, 10-1775 (La.App. 4 Cir. 4/4/12), 96 So.3d 1165, 1176 (Bonin, J. dissenting), writ granted, 12-1021 (La.12/14/12), 104 So.3d 425, 2012 WL 6734801; State v. Patterson, 11-0648 (La.App. 4 Cir. 8/24/12), 98 So.3d 439 (Table) (Landrieu, J., concurring; McKay, J., dissenting), writ granted, 12-2042 (La.12/14/12), 104 So.3d 426, 2012 WL 6734803.
In this case, however, Mr. Smith did not seek to timely invoke our supervisory jurisdiction so that we might review the trial court’s erroneous restriction on his right to back-strike and promptly correct the error before jury selection was completed and the jurors sworn. See La. Const. art. V, § 10(A). And, importantly for the purposes of his appeal, he did not identify any juror whom he wished to back-strike at any time before the jury was sworn. After the jury’s verdict, in his motion for new trial, did Mr. Smith first identify two jurors whom he said he would have back-struck but for the trial court’s error. Thus, in | uthe absence of identifying the objectionable jurors at the time of jury selection, we conclude that Mr. Smith failed to preserve the error for our review.
In State v. Hailey, 02-1738, p. 6 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 567, the defendant did not identify any juror whom he wished to back-strike until the hearing on his motion for new trial. We concluded that although there was then no jurisprudence requiring contemporaneous identification of an objected-to juror as essential to preserve the back-strike claim for review to consider on appeal such a claim would allow the defense to “gamble upon receiving a favorable jury verdict, and then, upon the return of an unfavorable verdict, scour the voir dire transcript for jurors whom he can claim he would have backstruek.” Id., p. 8, 863 So.2d at 569. *386 See also State v. Crotwell, 00-2551 (La.App. 1 Cir. 11/9/01), 818 So.2d 34.[7]
We now conclude that in order to preserve this issue for appellate review following conviction a defendant who has not timely sought supervisory review of an erroneous trial court ruling which restricts his right to fully exercise his peremptory challenges through back-striking must pri- or to the swearing in by the court of the full complement of jurors identify the specific jurors whom he would have challenged but for the trial court’s ruling. Because, just as in Hailey, Mr. Smith did not identify any specific juror, we find that he has not preserved the issue for our appellate review and consideration.
_bm
In this Part we address our review of the trial court’s rulings on the various motions for mistrial and conclude that in each instance there is no reversible error.
A
First we address the contention that the State, on two separate occasions during trial, improperly solicited testimony regarding Mr. Smith’s prior convictions. Mr. Smith, citing La.C.Cr.P. art. 770, argues that a mistrial, although a drastic remedy, should be awarded because there were references to Mr. Smith’s prior criminal background. La.C.Cr.P. art. 770 states, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
As the statements were not made by “the judge, district attorney, or a court official,” Article 770 is not applicable; and instead, La.C.Cr.P. art. 771 should be used. See State v. Carter, 412 So.2d 540, 544-545 (La.1982) (“[A] police officer is not a ‘court official’; therefore, art. 770 does not apply. Rather, art. 771 of the Code of Criminal Procedure would be the applicable article.”) La.C.Cr.P. art. 771 provides, in part, that if it is a witness that references other crimes, “the court may |1figrant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.” It is, therefore, permissible and not mandatory as Mr. Smith suggests that a mistrial be granted.
The admission of other crimes evidence is reviewed under the harmless error analysis. See State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102.
1
Mr. Smith first moved for mistrial on the basis that the state’s witness, Officer George Jackson, testified that he was able to compare latent fingerprints collected at the crime scene with the fingerprints *387 that were “on file” for Mr. Smith, and by so testifying, illegally suggested to the jury that Mr. Smith had a prior criminal record. During a brief bench conference, the State argued that no mention was made of any criminal record, and that the file in question could have been created by any of a number of agencies. The district court denied the motion for mistrial and offered to admonish the jury, which offer was rejected by defense counsel. The district court further suggested that the statement could have meant that the comparison prints were taken from Mr. Smith in conjunction with this particular case. The district court instructed Officer Jackson not to state when or how Mr. Smith’s fingerprints were obtained and to avoid commenting that individuals listed in the Automatic Fingerprint Identification System do not necessarily have criminal backgrounds.
Because the file referenced could have been made in conjunction with the present case and no mention was made of prior convictions, admonishment to the 117jury, if anything, was all that was necessary. We find no error in the decision of the district court in this matter.
2
Mr. Smith’s second motion for mistrial arose out of Detective Thomas’ testimony that he had compiled a six-person lineup “based on [Mr. Smith’s] previous arrest information.” At the point in time when Det. Thomas compiled the lineup, Mr. Smith had already turned himself in, so the jury was aware of an arrest. But “previous” arrest suggests to the jury that the detective is referring to an arrest before the current one. The district court found that the statement was not prejudicial enough to rise to the level of requiring a mistrial. The district court offered to admonish the jury, which offer was declined. Like the reference to the fingerprints “on file,” we do not find that the district court erred in offering only an admonishment to the jury.
Mr. Smith argues that the above references to his criminal history forced him to make the last-minute decision to testify in his own defense at trial. But, by way of understatement, we find this argument difficult to accept. Without Mr. Smith’s testimony there would have been no testimony or evidence to support his claims of self-defense and accident.[8] The detective’s statement, moreover, was vague, tangential, and, as characterized by defense counsel, unintentional. It is not plausible that Mr. Smith would believe he was compelled to take the witness stand and admit that he was convicted in 2003 of possession of marijuana and cocaine | is(see La. C.E. art. 609.1 B) in order to offset that marginal comment by the detective. An admonition to the jury, at most, would have sufficed; no mistrial was necessary or required.
B
Mr. Smith’s third motion for mistrial was based on the prosecutor’s statements during his cross-examination of Mr. Smith, wherein the prosecutor used Mr. Smith’s pre-arrest silence and his retaining of an attorney to imply Mr. Smith’s guilt. Mr. Smith’s defense counsel, however, drew more attention to the challenged offenses than did the prosecution. The contentious discourse is reproduced below:
PROSECUTOR: And you never called 911.
MR. SMITH: No, sir.
PROSECUTOR: You never went talked [sic] to the police.
MR. SMITH: No, sir.
*388 PROSECUTOR: Until you got law-yered up.
DEFENSE: Lawyered up? Now we’re there. Now we’re there.
COURT: Sustained.
DEFENSE: Approach at side bar.
COURT: You don’t need to approach. Ask your next question, Mr. Phillips.
Examination by PROSECUTION continues:
PROSECUTOR: Right?
UiDEFENSE: He called his lawyer and his lawyer turned him in.
COURT: Mr. Boshea. Ask your next question, Mr. Phillips.
DEFENSE: Lawyered up.
PROSECUTOR: Well, he got a law-yered up.
[[Image here]]
DEFENSE: No. This is it, judge. I want the jury excused.
COURT: Gentlemen. I’m not doing it. Ask your next question.
PROSECUTOR: I will, Your Honor.
Examination by PROSECUTION continues:
PROSECUTOR: The point I’m making to you, sir, is that you went all of those days; you never called 911; never went talked [sic] to the police, ‘till you were able to do it your way, right?
SMITH: No, sir.
DEFENSE: Objection.
COURT: I’ll note your objection.
1
First we address Mr. Smith’s argument that his silence should not have been used to impeach his testimony. Mr. Smith alleges that the State improperly commented on his exercise of his right to remain silent after he was advised of this right. See Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The record, however, clearly shows that the timing of the “silence” in question occurred between the shooting and Mr. Smith’s turning himself in to the police. The prosecution, therefore, while trying Lpto imply a guilty conscience by commenting on Mr. Smith’s silence, did not violate any law or jurisprudential rule prohibiting such a comment.
The prohibition on the prosecution’s ability to comment on a defendant’s silence, in this situation, stems from the required Miranda warning given to arres-tees informing them of their right to remain silent. See Fletcher v. Weir, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). The Miranda warning implicitly assures an arrestee that his silence will not be used against him. See id. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, set forth a jurisprudential rule by which a defendant will not be disadvantaged by his reliance on this assurance. See Fletcher, 455 U.S. at 605, 102 S.Ct. 1309.
The protection extended by Doyle, however, applies to a person only after he has been Mirandized. See Fletcher, 455 U.S. at 607, 102 S.Ct. 1309. In Fletcher v. Weir, the Supreme Court found that a defendant’s silence after his arrest could be used to impeach his testimony where there was no evidence that the defendant had received a Miranda warning.
The Louisiana Supreme Court has followed this reasoning:
In the case of prearrest silence, in which “[t]he failure to speak occurfs] before the petitioner [is] taken into custody and given Miranda warnings,” and in which “no governmental action induce[s] petitioner to remain silent,” “the fundamental unfairness present in Doyle is not present.” Jenkins v. Anderson, 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 *389 L.Ed.2d 86 (1980). Neither Doyle specifically, nor the Due Process Clause generally, bars the inquiry. Jenkins, 447 U.S. at 239-40, 100 S.Ct. at 2129-30. In addition, Jenkins made clear, without expressly deciding “whether or under what circumstances prearrest silence may be protected by the Fifth Amendment,” id., 447 U.S. at 236 n. 2, 100 S.Ct. at 2128, that by taking the stand and exposing himself to cross-examination, “a defendant waives any Fifth Amendment | ⅞1 privilege he may have against the use of his prearrest silence for impeachment purposes.” Id., 447 U.S. at 235-36, 100 S.Ct. at 2127-28 (discussing Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926)). The federal constitution therefore leaves undisturbed the common law tradition which “allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.” Jenkins, 447 U.S. at 239, 100 S.Ct. at 2129 (citing 3A J. Wigmore, Evidence, § 1042, p. 1056) (Chadbourn rev.1970).
State v. Richards, 99-0067, p. 2 (La.9/17/99), 750 So.2d 940, 941.
The period of silence in question occurred between the shooting and Mr. Smith’s surrendering to the police. This is simply not the type of “silence” contemplated by Doyle. Mr. Smith’s assignment of error regarding his pre-arrest silence is, therefore, without merit.
2
We now address Mr. Smith’s challenge of the State’s implying his guilt by virtue of his retaining counsel. The State, in cross-examining Mr. Smith, commented that he did not talk to the police until he “lawyered up.”
While not codified in La.C.Cr.P. art. 770, as is the prohibition on the State’s commenting on a defendant’s choice not to take the stand, commenting by the prosecutor on a defendant’s retention of counsel has been found to be reversible error. See U.S. v. McDonald, 620 F.2d 559, 564 (C.A.5 1980) (“Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treats ment. Obvious | ^and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error.”).
We review the prosecutor’s comment under the harmless error analysis. See U.S. v. Martinez-Larraga, 517 F.3d 258, 269 (C.A.5 2008). Established case-law on the State’s commentary on a defendant’s right to remain silent do not justify the granting of a mistrial when the commentary refers to silence before a defendant is given his Miranda warning. Here, commentary refers to Mr. Smith’s retention of counsel at a time clearly before Mr. Smith was arrested. Thus, the promise implied by the Miranda warning not to mention a defendant’s exercise of his right to counsel is not implicated.
Justice Rehnquist, in a concurring opinion made the following comment regarding the prejudice presumed by a defendant’s seeking an attorney:
[A] request for a lawyer has essentially no probative value where the question is one of guilt or innocence: No sensible person would draw an inference of guilt from a defendant’s request for a lawyer after he had been told he had a right to consult one; it is simply not true that only a guilty person would want to have a lawyer present when being questioned by the police.
Wainwright v. Greenfield, 474 U.S. 284, 297, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). *390 While we do not condone prosecutorial commentary on a defendant’s choice to retain counsel before he contacts the police, we find that a rational jury would not infer guilt from this fact because most people, even when innocent, would want an attorney when they have criminal charges pending against them.
We find that the prosecutor’s statements did not justify a mistrial.
_biv
In this Part we address why we find that the sentence imposed by the district judge was within the court’s discretion and did not exceed the constitutional limit for the sentence of this offender for this offense.
Excessive sentences are prohibited under the Eighth Amendment of the Unites States Constitution and La. Const, art. I, § 20. A sentence may be constitutionally excessive even when the sentence falls within the range permitted by statute. See State v. Sepulvado, 367 So.2d 762, 769 (La.1979). For a sentence to be found excessive, it must be “so grossly disproportionate to the crime committed, in light of the harm caused to society, as to shock our sense of justice.” State v. Cann, 471 So.2d 701, 703 (La.1985). The district court is granted broad sentencing discretion, and we will not overturn the district court’s judgment absent an abuse of that discretion. See State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462.
To determine whether the district court has abused its broad sentencing discretion, we first discern whether the court took into account the sentencing criteria listed in La.C.Cr.P. art. 894.1. See Sepulvado, 367 So.2d at 767-768. The district court, while not required to expound on all factors listed in Article 894.1, is required to take into account both aggravating and mitigating factors. See State v. Square, 433 So.2d 104, 110 (La.1983). Our purpose is not to enforce mechanical compliance by a sentencing judge, but to ensure that there is a factual basis for the sentence imposed. See State v. Batiste, 06-0875, p. 18 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 820. If we find that the district court properly articulated its reasons for the defendant’s sentence, we then determine whether the defendant’s sentence was tailored to both the severity of his crime and his personal situation. See State v. Spencer, 374 So.2d 1195 (La.1979).
At the sentencing hearing, the district court noted that while the evidence may have shown that Mr. Smith did not go to the apartment with a weapon, and that the court was sympathetic for Mr. Smith’s family, the fact remains that Mr. Smith, according to his own testimony, shot Mr. Bourgeois multiple times while Mr. Bourgeois was unarmed, causing life-threatening injuries to Mr. Bourgeois. The district court, after considering the foregoing factors, sentenced Mr. Smith to seventeen years in the Department of Corrections.
The maximum sentence Mr. Smith could have received after his conviction for attempted manslaughter is twenty years. See La. R.S. 14:27 D(3) and La. R.S. 14:31 B. It is fortuitous that Mr. Bourgeois did not die from having been shot nine times by Mr. Smith. We find that the district court did not abuse its broad sentencing discretion in imposing a sentence near the maximum of the range. See State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462.
DECREE
Mr. Smith’s conviction and sentence are hereby affirmed.
AFFIRMED
LOVE, J., concurs in part and dissents in part.

. The sentence is with credit for time served, see La.C.Cr.P. art. 880, and concurrent with any other sentence, see La.C.Cr.P. art. 883.

. Initially, Mr. Smith had assigned as error that the trial judge did not charge the jury with aggravated battery as a responsive ver- *380 diet, but withdrew that assignment after the record was supplemented on this point.

. We previously conducted a review for errors patent under La.C.Cr.P. art. 920(2) and identified that the trial judge sentenced Mr. Smith before disposing of his motion for new trial. See La.C.Cr.P. art. 873. We remanded the motion for new trial to the district court for its consideration and stayed the proceedings here pending the trial court’s ruling. We have identified no other error patent.

. This section is reproduced from State v. Moore, 11-0025, pp. 5-7 (La.App. 4 Cir. 9/7/11), 75 So.3d 22, 25-26.

. Manslaughter is a responsive verdict to a charge of second-degree murder, and the relevant portion of the manslaughter statute constitutes a lesser-and-included offense of the relevant portion of the second-degree statute. In this case, the conviction under review is the jury’s selection of an unchallenged responsive verdict. Even if manslaughter was not a lesser-and-included offense of second-degree, we would still find sufficiency of evidence to prove the elements of second-degree murder, the offense charged. See La.C.Cr.P. art. 814 A(3) and C; State v. Porter, 93-1106, pp. 5-6 (La.7/5/94), 639 So.2d 1137, 1141; State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-252 (La.1982); State v. Pleasant, 10 *382 1533, p. 7 (La.App. 4 Cir. 5/18/11), 66 So.3d 51, 56.

. La.C.Cr.P. art. 799.1 provides:
Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788, in the jury selection process, the state and the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the jury composition or have exercised all challenges available to them, unless otherwise agreed to by the parties.

. We mentioned (also in the context of harmless-error review) in State v. Plaisance that “[although the record contains a full transcript of the general voir dire, the defendant does not refer to a single juror he would have struck.” State v. Plaisance, 00-1858, pp. 30-34 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193-1196.

. In fact, the sole defense witness was Mr. Smith.