JAMES F. McKAY III, Chief Judge.
hThe defendant, Allen Etienne, seeks the reversal of his conviction and sentence. The defendant was charged with La. R.S. 14:42.1, forcible rape. The jury found him guilty as charged. The district court, pursuant to multiple bill of information, adjudicated the defendant a habitual offender and imposed a life sentence the custody Louisiana Department of Corrections. See La. R.S. 15:529.
STATEMENT OF CASE
On April 11, 2012, the State filed a bill of information charging the defendant with one count of the forcible rape of K.O., a violation of La. R.S. 14:42.1. At his arraignment on April 16, 2012, the defendant entered a not guilty plea and through counsel filed omnibus motions for discovery and several motions to suppress. On July 13, 2012, the district court denied the motions to suppress and found probable cause to hold the defendant in custody. Later, the State filed a motion to introduce the defendant’s other crimes as evidence at trial. The trial court granted the motion on November 11, 2012 after hearing the parties’ arguments. The defendant objected and gave notice of intent to file a writ. The writ application was denied by this Court on January 18, 2013. On January 22, 2013, the matter proceeded to trial but ended in a mistrial. On July 9, 2013, a |2second trial began but ended with a hung jury. On December 3, 2013, a third trial commenced. On December 4, 2013, the jury returned a verdict of guilty as charged. On February 21, 2014, after denying the defendant’s motion for new trial and post-verdict judgment of acquittal, the district court sentenced the defendant to serve forty years at hard labor without benefit of parole, probation, or suspension of sentence.
The State then filed a multiple bill of information. The district court adjudicated the defendant a fourth-time felony offender, vacated the defendant’s initial sentence and resentenced him, as a habitual offender, to life imprisonment in the custody of the Louisiana Department of Corrections.
STATEMENT OF FACT
On December 13, 2011, at approximately 6:30 p.m., New Orleans Police Department (“NOPD”) Officer Glen Markham was in the process of handling a traffic violation when he was flagged down by a female, K.O., who claimed that she had been raped and beaten up. Officer Markham called NOPD dispatch to contact the Sex Crime Division.
Emergency Medical technician (“EMT”) Raul Vallencillo responded to the call near the intersection of St. Bernard and Claiborne Avenue. He conducted an exam of K.O. at the location and noted that K.O. had a swollen lip, two swollen eyes, swell *44 ing to the head, ears, nose, eyes and throat, and a hand print on her neck. He also noted the smell of alcohol on her breath. He recommended that K.O. go to the hospital for treatment, but she refused.
Detective Derrick Williams of the Special Victim’s Section of the NOPD, was assigned to the call. He spoke to K.O. at the scene. She initially told Detective Williams that she had been with a black man that she had just met at St. RLouis and Basin Street. They left the area and went to a new location where another unidentified black man grabbed her and pulled her into a closet at an abandoned home where he beat and raped her; she described the perpetrator as being six feet tall and weighing between 175 and 180 pounds. She was unable to give a specific location where the incident took place.
The following day, K.O. made a 911 call to make a police report that her truck had been stolen after the rape. She advised the operator that she had been beaten and raped the previous night and that the perpetrator had stolen her truck. She described him as being big, and around 250 pounds. She advised the operator that she wanted to pursue the case and that she was on her way to the hospital. K.O. then went to University Hospital for a sexual assault examination. Following the completion the sexual assault examination, the rape kit was sent to the Louisiana State Police and the alleged rapist’s DNA was placed in the CODIS database.
A few days later, K.O.’s boyfriend, Brian Davis, located her missing truck at the corner of St. Bernard and Rampart Street. He and K.O., while driving around the area, located the house that was the scene of the.crime, which was approximately fifty to seventy yards from Claiborne Avenue at 1624 Lapeyrouse Street. They informed Detective Williams of the discovery.
On February 3, 2012, Detective Williams received a CODIS hit letter, informing him that the defendant’s DNA matched the DNA sample taken from K.O.’s rape assault exam kit. Following this discovery, Detective Williams contacted K.O. to inquired if she knew the defendant and if she had consensual sex with him. K.O. answered in the negative to both questions. Detective Williams then obtained an arrest warrant for the defendant. After the defendant’s arrest, |4Petective Williams obtained a search warrant to take a buccal swab from the defendant which ultimately confirmed the CODIS match. ERRORS PATENT
A review of the record reveals one patent error. The February 21, 2014 minute entry stated that the defendant was sentenced “as a multiple offender under R.S. 15:529.1, to serve life at hard labor in the custody of the Louisiana Department of Corrections.” The sentencing transcript reads:
At this time, Mr. Etienne, I am setting aside the original sentence imposed of 40 years in the custody of the Department of Corrections, and now sentencing you, pursuant to Louisiana revised statute 15:529.1 to life imprisonment.
Your calculation for parole will be made by the Department of Corrections, pursuant to that by the Multiple Offender Statute. You will serve as many days as the Department of Corrections finds that you are entitled to as to the life imprisonment.
Any parole, anything that you have in regard to that, that is for the Department of Corrections to calculate.
The sentencing references do not indicate that the sentence is to be served without benefits of parole, probation or suspension of sentence; however such is imposed by operation of law in light of La. *45 R.S. 15:529.1(a)(4)[1]. There is no need to correct this error on appeal; it is automatically corrected by operation of law.
|B... we recognized that this provision [La. R.S. 15:301.1(A) ] directs that sentences that require statutory restrictions on parole, probation, or suspension of sentence are ‘deemed to contain [those] provisions,’ (footnote omitted) (emphasis added in original) whether or not the sentencing court pronounces those restrictions at the time of initial sentencing. It is clear from the statutory language that this proviso is self-activated, eliminates the remand for ministerial correction of sentence, and requires no notice to the defendant.
State v. Williams, 2000-1725, p. 14 (La.11/28/01), 800 So.2d 790, 801.
ASSIGNMENT OF ERROR
In his sole assignment of error, the defendant argues that the evidence was insufficient to uphold his conviction. Specifically, the defendant calls into question KO.’s credibility and argues that based upon those inconsistencies, no reasonable juror could have found him guilty.
The defendant contends that the State failed to meet the requirements of La. R.S. 14:42.1 and prove, beyond a reasonable doubt, that he had sexual intercourse with K.O. without her consent and that he physically threatened her. La. R.S. 14:42.1(A)(1)(2) states:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
lfiTo support his assertions, the defendant pointed to various inconsistencies in KO.’s testimony. While the defendant admits that he engaged in consensual sexual *46 intercourse with K.O., he asserts that it was only after the defendant’s DNA was found on her body that she changed her testimony from there being two men (“Steve” and the man who raped her) to identifying the defendant as the rapist. He maintains that K.O. described him as “Steve” and approximately 5'7" and around 150 pounds. Conversely, he asserts that K.O. described the rapist as being big and around 250 pounds. K.O. also stated that Steve wore blue jeans, a hat, and a suit jacket, and did not appear to be homeless or dirty, unlike the rapist who stank so badly she still remembered the smell, yet made no comments about Steve’s smell when he was in her truck. He also claims that he did ejaculate in K.O., while she testified that the rapist did not, explaining the reason for his DNA on her body. He maintains that if it were KO.’s intention to sober up after leaving the bar and meeting “Steve”, she would not have agreed to go another place with him to “party’. Also, the defendant reflects on the testimony of Mr. Davis, who stated how K.O. valued and loved her truck so much so that he left the hospital to find it to comfort her. However, the night before she allowed a total stranger to drive it, which he points out is a clear inconsistency. He argues that the smell of alcohol noted on her breath is not consistent with having only two shots earlier, and the hospital did not test her blood alcohol level, which may have revealed she was more inebriated than she alleged.
As to the issue of misidentification, again, the defendant argues that while DNA from the rape kit matched his DNA, it only proves that the parties engaged in intercourse, and does not support a forcible rape charge. The State counters the [7defendant’s-. argument by pointing out that the defendant misinterprets Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) which, when addressing the issue of reasonable doubt, states:
But this inquiry does not require a court to “ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.” Woodby v. INS, 385 U.S. [276], at 282, 87 S.Ct. [483], at 486[, 17 L.Ed.2d 362] [ (1966) ] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Johnson v. Louisiana, 406 U.S. [356], at 362, 92 S.Ct. [1620], at 1624-1625[, 32 L.Ed.2d 152] [ (1972) ].
Jackson, 443 U.S. at 318-19, 99 S.Ct. at 2789, 61 L.Ed.2d 560 (1979). The State suggests that the defendant’s interpretation of Jackson is incorrect. The State maintains that in order to overturn the defendant’s conviction not every jury would have to find the defendant guilty, just a rational jury.
The State asserts that the defendant failed to produce any evidence to support this claim that he had consensual sex with K.O. and that another man raped her. The State maintains that the credibility of the witnesses is for the fact finder to determine, and in the instant matter, the jury believed K.O. and all of the witnesses who corroborated her story.
Standard of Review
Under the well-known Jackson v. Virginia standard of review, there are tried and true principles of review. First, we consider all of the evidence that the jury considered. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, in reviewing for sufficiency of evidence, we do not ignore evidence which was erroneously admitted at the trial or evidence which could have been excluded as, for *47 example, inadmissible hearsay.5 See State v. Hearold, 603 So.2d 731, 734 (La.1992).
And, second, all of the evidence is viewed in the light most favorable to the prosecution. See State v. Fields, 12-0674, p. 6 (La.App. 4 Cir. 6/19/13), 120 So.3d 309, 315. Thus, in evaluating sufficiency of the evidence, we are not merely limited to the evidence itself, but may consider all reasonable inferences from the evidence Iswhich the fact-finder could have made. Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
In similar fashion, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. See State v. Shapiro, 431 So.2d 372, 378 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438.
And, third, in evaluating a defendant’s challenge to the sufficiency of evidence, we are restricted to those theories of defense actually put forward to the trier of fact. See State v. Juluke, 98-0341, pp. 4-5 (La.1/8/99), 725 So.2d 1291, 1293-1294 (per curiam). In other words, a defendant may not develop a new theory on appeal and demonstrate that the circumstantial evidence was insufficient to negate the new theory. Id.
And, fourth, in our review, we are highly deferential to the trier of fact. State v. Smith, 11-664, p. 4 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 381. Thus, we assume that the jury can accept as true the testimony alone of any witness, even a single witness. State v. Sanchell, 11-1672, p. 6 (La.App. 4 Cir. 10/31/12), 103 So.3d 677, 680. We will only tread on a jury’s presumed acceptance of a witnéss’ testimony when the testimony is implausible or clearly contrary to documentary evidence. See State v. Mussall, 523 So.2d 1305 (La.1988).
State v. Hamdan, 2013-0113, pp. 9-10 (La.App. 4 Cir. 12/11/13), 131 So.3d 197, 203-04.
DISCUSSION
Officer Glen Markham testified at trial that he has been on the New Orleans Police Force for twenty-eight years and with the motorcycle division for twenty-six years. He testified that on December 13, 2011, while he was patrolling the intersection near St. Bernard and N. Claiborne Avenues and working on a traffic citation, he was approached by K.O. He stated that K.O. had a bloody nose and black and blue eyes (as if she had been beaten), and she was hysterical. He testified that K.O. told him that she was raped and beaten. He called for members of the Sex Crimes Unit, who came to the scene.
| gRaul Vallencillo, an Emergency Medical Technician (“EMT”) for the City of New Orleans, testified at trial that he had been with EMT for seventeen years and worked for the City of New Orleans for seven years. He stated that he is also a captain in the St. Bernard Fire Department. He testified that on the night of December 13, 2011, he was working with his partner Dave Frissel when they responded to a call at the intersection of St. Bernard and N. Claiborne Avenues. He testified that when he got to the scene he witnessed a woman who looked as though she had been beaten up, and he took a patient care report on her. At trial, he described what the patient care report contained, and the report was submitted into evidence. He stated that the report noted, alcohol on the patient’s breath; that she was intoxicated; and that she was unstable and could not answer questions. *48 Despite Mr. Vallencillo’s insistence, the patient did not go to the hospital with him or his partner that evening.
Detective Derrick Williams testified at trial that he worked in the NOPD Special Victims Section and that he had been working with the NOPD for seventeen years. He testified that on December 13, 2011, he was notified of a female victim who was physically beaten and sexually assaulted and that she was located at the intersection of St. Bernard and N. Claiborne Avenues. He testified that he witnessed K.O. being treated by EMS when he arrived, and it was evident that she had been beaten. He stated that she was crying and afraid. Detective Williams stated that K.O. told him that she did not want to continue an investigation and that she wanted to go home. Detective Williams informed K.O. that in the event she wanted to continue the investigation, her case would remain open. He stated that First District Lieutenant Montiverde took her home.
| inDetective Williams testified that the investigation continued the following morning when K.O. presented to University Hospital, where she underwent a sexual assault exam. Detective Williams identified the clothing worn by K.O. the evening of the incident. Detective Williams was able to interview K.O., who stated that she remembered two perpetrators. He also stated that the night of the incident her vehicle was stolen, later recovered by her boyfriend and processed with NOPD. Detective Williams testified that it was revealed through CODIS that the DNA was that of the defendant, whom K.O. stated she did not know. Detective Williams obtained an arrest warrant for the defendant. A few days later K.O. contacted Detective Williams and was able to show him the abandoned house located at 1624 Lapey-rouse Street where she was raped.
On cross-examination, Detective Williams testified that he failed to conduct a photographic line-up because K.O. told him that she could identify “Steve” but not the other individual whom she alleged was her assailant. He also conceded that neither the defendant’s fingerprints nor DNA was found at the crime scene.
Bryan Davis testified that K.O. was his fiancée, and they had been dating for four and a half years. He testified that on December 13, 2011 he was at home when the police came to his house and told him that K.O. was at the police station. He took a taxi cab to go get her. He testified that when he arrived at the police station, he saw that K.O. had been beaten. He stated that they went straight home from the police station.
Brian testified that the next morning K.O. reported the rape and the stolen vehicle to the NOPD via telephone and went to the hospital. He testified that Detective Williams took him and K.O. to the location where Detective Williams was called to the night before. Brian Davis also testified that he went in search of | ii her stolen truck, which after nine hours of searching on foot, he found on Rampart Street. Brian Davis called Detective Williams and informed him that the truck was found. He then removed the truck from the location where he found it and returned it to K.O.
Sexual assault nurse, Casey Malbrough, testified at trial that she was employed a Tulane Lakeside Hospital and attested to her schooling, training, and previous jobs in psychology and nursing. She testified that on December 14, 2011 she was working at East Jefferson General Hospital and University Hospital, and she conducted a sexual assault examination on K.O. Ms. Malbrough authenticated for the jury photos she had taken the day of the exam.
*49 On cross-examination Ms. Malbrough testified that K.O. told her that the man who raped her did not ejaculate; that she drove her car with the defendant in it; and that another African-American male beat and raped her.
K.O. testified to the following. She was originally from Vermont and moved to New Orleans for work. On December 2011, she was working at the Royal Sones-ta Hotel as a banquet server and that on the night she was raped, she had left work at 4:30 in the afternoon and stopped in a bar, where she knew the bartender, and had two shots of Rumplemint. She stated that she met “Steve” as she left the bar, and he offered to take her “someplace cool”. She allowed “Steve” to drive her car, but he punched her, drove her to an abandoned building, pulled her from the car, punched her again, and dragged her into the building. She described how she was then pushed to the floor, made to perform oral sex, and then raped from behind. She recalled being in a room that she believed to be a bathroom because it had white tile walls. However, she did not see any faces once she was pulled into the building.
| iaK.O. testified that once she heard “Steve” leave, she put on her jeans, left her underwear and her purse because she could not find them, and ran out of the building. Once she was on the street, she began banging on car windows to get people’s attention but was ignored until she flagged down a police officer, who took her to the police station where she made a statement and then her fiancé, Brian Davis, picked her up. She testified that she and Mr. Davis went home, and she did not shower or have intercourse. She testified that the next day she went to the hospital where the nurse performed a rape kit. She met with Detective Williams at her home after she left the hospital. At that time she learned that her fiancé had located her truck. A couple days later K.O., with Detective Williams, was able to locate the building where “Steve” took her.
On cross-examination, K.O. testified that she thought that there was another man other than “Steve” who assaulted her because she recalled “Steve” had a nice demeanor and voice, and once she was pulled into the building her aggressor felt large and had a deep voice and a distinct smell. She testified that she was embarrassed that she made a “stupid decision” to go with “Steve”, and when she reported the incident she was not in her right mind and “dizzy and distraught.”
J.M. testified on behalf of the State, pursuant to motion granted by the district court and upheld by this Court in a writ application, to admit other crimes evidence at trial, that in 2002 she was homeless and had been living at the Covenant House in New Orleans for approximately six months. She testified that on May 3, 2002 she went to a drop-in health clinic with her friend, and she took a condom from the health clinic. She then went to Armstrong Park to eat lunch. She stated that she was sitting on a bench in Armstrong Park, smoking a cigarette, l^when a man approached her and introduced himself as “Steve,[2]” whom she recognized earlier because he was talking to her friend outside the drop-in clinic. She testified that “Steve” asked her for a cigarette, she shared her cigarette with him. “Steve” showed J.M. that underneath his hoodie he had a gun, threatened her, and dragged her down the street. She testified that *50 “Steve” stopped and talked to people sitting on a porch, and the people he spoke with were not concerned that she was crying. “Steve” took her to an abandoned building on Esplanade and St. Claude.
J.M. testified that once she was in the abandoned house, “Steve” threated to hit her with a brick if she did not cooperate. After removing the condom that she had placed in her bra earlier that day, “Steve” proceeded to rape her from behind. Once “Steve” was done raping J.M., he apologized to her, explained that he was on drugs, and walked her back to the Covenant House, where she called the police. She testified that she identified “Steve” to the police because he wa,s in the bar across the street after the incident. She testified that a rape kit was performed on her in the hospital. J.M. identified the defendant sitting in the court room as “Steve”. She stated that she did not have consensual sex with the defendant.
Dr. Richard Richoux testified that he is a Board Certified Psychiatrist who specializes in forensic psychiatry. He stated that the defendant was competent to stand trial.
At trial, Erica Sparacino testified that she works with the Louisiana State Police, and she oversees forensic DNA scientists. She described CODIS to the jury. She stated that the rape kit taken on K.O. at the hospital revealed the defendant’s DNA on a swab taken from KO.’s vagina.
114In order for the State to prove that the defendant committed forcible rape, it must prove that the sexual conduct was unlawful because K.O. was prevented from resisting it with force, and she believed that resisting it would not prevent her from being raped. See La. R.S. 14:42.1.
Applying the analysis in State v. Hamdan, first, this Court must consider all of the evidence presented to the jury. Once again, the jury was left to contemplate K.O.’s testimony that she had been raped by the defendant, the rape' report, the witnesses’ account of the events, and the evidence that the DNA found on K.O. matched the defendant.
Next, this Court must consider reasonable inferences the jury could have made. Although it was reasonable to infer that K.O. may have had consensual sex with the defendant and perhaps been raped and beaten by another man, the evidence excluded that reasonable hypothesis because the jury was not presented with any evidence that suggested that scenario. Yet, the jury, on its own could have considered an alternate scenario from the evidence that was before it.
Lastly, although K.O. offered several renditions of the events, this Court is highly deferential to the trier of fact. “The testimony of one witness is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency.” State in Interest of K.M., 2014-0306 (La.App. 4 Cir. 7/23/14), 146 So.3d 865, 871-72 (citing State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.3d 603, 634). “The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and credibility will not be reweighfed on appeal.” State in Interest of T.W., 2013-1564 (La.App. 4 Cir. 5/14/14), 141 So.3d 822, 826 (citing State v. Vessell, 450 So.2d 938, 943 (La.1984)). In State v. Celestain, 2013-1262 (La.App. 4 Cir. 7/30/14), 146 So.3d 874, 882-83 this Court recognized the Louisiana Supreme Court’s rationale that “... in cases involving circumstantial evidence, if jurors reject a defendant’s hypothesis of innocence, the defendant is guilty unless there is another hypothesis *51 establishing a reasonable doubt of the defendant’s guilt.” (citing State v. Smith, 12-2358, p. 6-7 (La.12/10/13), 130 So.3d 874, 878).
Based upon the record before this Court, the State presented sufficient evidence to establish that the defendant, beyond a reasonable doubt, forcibly raped K.O. and that that evidence was sufficient to allow a rational trier of fact to find the defendant guilty.
CONCLUSION
Based on the above and foregoing we affirm the defendant’s conviction and sentence.
AFFIRMED.

. La. R.S. 15:529(A)(4) states:
A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
[[Image here]]
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term not less than the longest prescribed for a first conviction ' but in no event less than twenty years and not more than his natural life; or
(b) If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B), a sex offense as defined in R.S. 15:540 et seq. when the victim is under the age of eighteen at the time of commission of the offense, or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for ten years or more, or of any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension . of sentence.

. The defendant, Allen Etienne is referenced as "Steve” throughout the witnesses' testimony-