JAMES F. McKAY, III, Chief Judge,
h STATEMENT OF CASE
On November 14, 2013, the defendant, Alfred Everette, was indicted for the second degree murder of Ernest Smith in violation of La. R.S. 14:3o.!.[1] On December 3, 2013, the defendant entered a plea of not guilty at his arraignment. On December 2-4, 2014, after a jury trial, the defendant was found guilty as charged. The defendant filed motions for post-verdict judgment of acquittal and for new trial, which were denied on February 11, 2015. On the same date, the defendant waived delays and was sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence. The defendant’s motion for appeal was granted, and a return- date of May 11, 2015, was set.
STATEMENT OF FACT'
On April 12, 2006, Ernest Smith was gunned down just outside his home on 10700 Roger Drive, Apartment “D” in a relatively abandoned area of New Orleans East. He had received two fatal gunshot wounds to the chest. His wife, Emma, heard the shots just before Ernest Smith came through the front door. She then 12called 911 at around 11:30 p.m.[2] At the time of Ernest Smith’s death, the New Orleans Police Department (“NOPD”) was unable to identify a suspect, .and the case remained unsolved. As a "result, the case grew cold. However, suspicions developed when the victim’s wife, Emma was a suspect in another similar murder in 2011, of her then husband, James Raine, in Mississippi. The suspicious deaths of both Ernest Smith and James Raine, who both had large life insurance policies, benefited Emma.1
The following relevant testimony took place during trial.
.Ronald Mason testified that he and the victim, Ernest Smith, were good friends, had worked together and shared an interest in motorcycles. On April 12, 2006, Mason called Ernest and asked if he wanted to go to “Bike Night” that night. After leaving “Bike Night”, Mason drove Ernest home where they spoke for approximately fifteen to twenty minutes before Mason drove away around 11:15 p.m. Mason then went to pick up his wife from the trailer where they were staying. When Mason *252 arrived at the trailer, he received a telephone call from Emma, who told him that Ernest had been shot. Mason and his wife drove to Ernest’s apartment. When they arrived there, the police and coroner were already on the scene. Mason told the police that he had just dropped Ernest off at the'apartment. He asked a police officer if he could speak with Ernest. Despite the fact that Ernest had expired, the officer told him that Mason needed to get permission from Emma. Emma refused to allow him to speak with Ernest. Mason also testified that when he arrived on the scene, Emma did not have any blood on her. When he |swent into the apartment, he saw a lot of blood. Mason went into the bedroom and noted that the bed was made. Mason also said that Emma used Ernest’s phone" to call and tell him that Ernest had been shot and noted that Emma called him before she called 911.
Mason testified that after Ernest’s death, he received a telephone call from Emma during which Emma told him that she and Ernest were having marital problems. Emma told Mason that she was having an affair. Emma stated that she had been working for the man who owned the apartment complex, and a relationship developed between them. After Mason got off the telephone with Emma, he called the police and let them know about the conversation. He provided the information to the police, including Detective Barnes.
On April 12, 2006, at approximately 11:30 p.m., Sergeant Randi Gray Gant responded to Emma’s 911 call. When Sergeant Gant arrived on the scene, the victim had already expired. The victim was found on the steps going into the apartment. Sergeant Gant identified photographs taken of the crime scene. She identified the bullet casings found on the scene.
Sergeant Gant. spoke with Emma who told her that she had been asleep, and her husband had gone out with a friend that evening. Emma stated that she had a toothache and had taken some pain medication. She heard her husband open the door,. and say, “Honey, I’ve been shot.” She ran downstairs and saw Ernest lying on the steps. She went back upstairs, got her cell phone and called 911. Emma stated that she had heard a popping noise, but that she did not think it was a gunshot. Sergeant Gant opined that Emma did not appear as a normal person would who had just lost a loved one as Emma was not crying and appeared stonejfaced. The Sergeant Gant testified that at one point, Emma attempted to cry, but that it appeared phony.
Officer Kenneth Leary, a firearms examiner with the NOPD Crime Lab, examined the casings and. pellet found on the crime scene. Officer Leary testified that the casings were fired from the same weapon — a nine millimeter. He also stated that the pellet was consistent with nine millimeter ammunition.
Dr. Richard Tracy, a forensic pathologist with the Orleans Parish Coroner’s Office, conducted an autopsy on the victim. Dr. Tracy testified that victim had been shot twice in the chest and that either wound would have been fatal.
Bishop B.R. Jackson stated that he met the victim, Ernest Smith, in the 1990s through a mutual friend and that Ernest Smith had become one of his pastors. He testified that Ernest Smith and Emma had some marital problems but that he had encouraged him to work on his marriage. He admitted that he later learned that Emma was having an affair with someone by the name of James. At approximately 3:00 a.m. on April 13th, Emma called Jackson to tell him that Ernest had died.
*253 Detective DeCynda Barnes was assigned to the Cold Case Unit of the NOPD Homicide Division in March 2012. On March 7, 2012, Enoch Raine and William Fowler requested to speak with a cold case detective about the homicide of Ernest Smith on April 12, 2006. Detective Barnes met with the men, who provided information about Ernest Smith’s homicide. They told her that their brothers, James Raine and the defendant, Alfred Everette, had perpetrated Ernest Smith’s murder. The men provided details that Ernest Smith had been shot twice with a nine millimeter gun. Enoch Raine and William Fowler stated that they obtained their information from the defendant. The defendant told them that he had to wait | ¡¡behind a building because Ernest Smith was speaking with someone prior to going into his residence. After the individual left, the defendant shot Ernest Smith.
After reviewing the initial police report concerning the homicide and corroborating Enoch Raine’s and William Fowler’s information, the officer contacted the men and took formal statements from them. Detective Barnes also obtained the coroner’s report and the ballistics report and viewed the crime scene photographs. She learned that the victim had been shot outside his residence. The evidence was consistent with the information she received from Enoch Raine and William Fowler. During her investigation, Detective Barnes learned that the defendant’s sister, Keisha, was in the defendant’s vehicle at the time he shot Ernest Smith. Detective Barnes contacted Keisha and corroborated information that the officer had received from the witnesses.
Detective Barnes then contacted Lieutenant Brad Garrett with the Mississippi Bureau of Investigation. He stated that he told Lieutenant Garrett that he had been in contact with Enoch Raine, William Fowler and Henry Fowler. Detective Barnes met with Lieutenant Garrett, and they exchanged information about their respective cases. Detective Barnes obtained a statement from Emma taken by the Mississippi police in which Emma stated that the defendant and James Raine were responsible for Ernest Smith’s murder. Based on the information that she had gathered an arrest warrant was issued for Emma.
Enoch Raine, brother of James Raine and foster brother of the defendant, Everette, testified that he knew about James’ relationship with Emma. He also knew that Ernest Smith and James served together in the National Guard in Iraq. About a year before Ernest Smith was killed, he found out that James and Emma were having an affair.
I (James Raine and Emma continued their relationship after Ernest Smith’s death. They eventually built a large home in Poplarville, Mississippi, and married. James was killed on October 21, 2011. He was shot inside his home. As soon as Enoch Raine had been told about the shooting, he went to his brother’s house. There was talk that James and the defendant were involved in Ernest Smith’s murder. After James was killed, Enoch Raine decided to confront the defendant about his involvement in Ernest Smith’s murder. Enoch Raine was concerned that if the rumors were true, the defendant’s life was in danger.
After James’ funeral, Enoch Raine and William Fowler confronted the defendant with information that he was involved in Ernest Smith’s murder. The defendant admitted that he shot Ernest Smith. The defendant told them that Emma and James had approached him about shooting Ernest Smith. The defendant also told them that he waited outside the abandoned apartment building where Ernest Smith *254 and Emma were living. He had been waiting for about one and one-half hours when Ernest Smith and another man pulled up. Ernest Smith and the man talked for about fifteen to twenty minutes before the man left. After the man left, he came from around the building, went up to Ernest Smith and shot him twice in' the chest. The defendant said that he then ran off and got in his sister’s car, which was parkéd a few blocks away in the driveway of an abandoned house. His sister, ■Keisha, was asleep in the car. The defendant said that he used a nine’ millimeter gun, which he threw in Lake Pontchartrain as he drove oyer 1-10 on his way back' to Mississippi. The defendant said that James and Emma promised him eight' to ten thousand dollars, but he'only got two clunker cars. Enoch Raine and William Fowler took .the defendant to talk to his Uncle Henry Fowler. The defendant told his Uncle Henry the same story as he had told Enoch Raine and William Fowler. [7The Mississippi police became aware of the defendant’s admissions a few weeks later.'
Enoch'Raine stated that-he received a phone call from a person who did not identify himself, but stated that there would be some papers.-in-his mailbox the next morning. The next day Enoch Rainé found documents concerning Prime America’s lawsuit against - Emma, which revealed that Prime America was suing to prevent Emma from obtaining the insurance proceeds from Ernest Smith’s policy. The documents also indicated that James Raine had been involved in Ernest Smith’s murder.- Enoch Raine gave copies of the lawsuit to the • Mississippi police and the NOPD. Enoch Raine* also met with Detective Barnes and gave her a taped statement concerning what the defendant had told him.
William Fowler, Jr., the uncle of James Raine, Enoch Raine and Alfred Everette and brother of Henry Fowler, stated he knew Ernest Smith and Emma through James. Ernest Smith and James had served in Iraq together; He learned that James and Emma were in a relationship while Emma was still married to Ernest Smith. - William overheard a conversation between Ernest Smith and James about Emma where Ernest Smith confronted James about the relationship. He learned at some point that Ernest Smith had been murdered. Prior -to James’ death, he had no reason to believe that James or the defendant had-anything to do with Ernest Smith’s murder because James had previously told him that he had nothing to do with Ernest Smith’s death.
William learned that James’ mother discovered his body. When William went to James’ house he heard' people talking about James and the defendant’s involvement in Ernest Smith’s death. His testimony corroborates Enoch Raine’s rendition of the events that followed when he and Enoch confronted the defendant. -
I «Henry Fowler, brother of William Fowler, Jr., and uncle of James Raine, Enoch Raine and the defendant, corroborated the- testimony of Enoch Raine and William Fowler, Jr.
Lieutenant Brad Garrett, a member of the Mississippi Bureau of Investigation, testified that he was involved in the investigation into James Raine’s homicide. Lieutenant Garrett stated that he was familiar with the deceased and his family. On the day of the homicide, the officer spoke with’ Enoch' Rainé and William Fowler. The officer had asked them if they knew of anyone who would want to, harm or kill James -Raine. The men gave him a few names, .and the officer began interviewing people. Shortly thereafter, the officer was made aware of an insur- *255 anee fraud ease involving Emma, whose prior husband, Ernest Smith, had been killed in New Orleans.
The officer discovered that Emma had taken out a life insurance policy on Ernest Smith in 1997 for one hundred thousand dollars. At that time, Emma was the named beneficiary. The policy was amended several times to increase the benefits. In April 2000, the policy benefits were increased to three hundred thousand dollars. In January 2004, the benefits increased to four hundred fifty thousand dollars. The benefits were increased to eight hundred thousand dollars in November 2005. In February 2006, the beneficiaries were changed to James Raine and the estate of Ernest Smith. After- Ernest Smith was killed, , Emma attempted to collect the insurance benefits. Emma’s daughter, Keish Curry, represented herself as Ernest Smith’s daughter, Queen-teen Jefferson, and assigned the “daughter’s interest in the insurance benefits to Emma. Emma and her daughter were charged with forgery. Emma’s daughter pled guilty to forgery in July 2014.
| aLieutenant Garrett testified that Emma was the named beneficiary on a life insurance policy in James Raine’s name. The officer noted that Emma’s first husband, Leroy Evans, was struck by a vehicle and paralyzed from the neck down. According to the coroner, Leroy Evans died in his sleep; he regurgitated' matter and suffocated. Lieutenant Garrett also testified that Enoch Raine and William Fowler spoke with him about the defendant, and the defendant’s admission that he was involved in Ernest Smith’s murder. The Lieutenant stated that he found both men to be honest and trustworthy.
Donald Glover testified that he was in prison at the same time as the defendant, and that the defendant admitted to him that he was involved in Ernest Smith’s murder. During direct examination by the State, Glover acknowledged his prior convictions, which included criminal trespass in 1991; possession of cocaine in 1996; theft of a motor vehicle, flight from a police officer and possession of marijuana in 1997; possession of a stolen vehicle in 1999; and misdemeanor assault in 2001. At the time of trial, he was- incarcerated while waiting for trial on charges for vehicle burglary, bond jumping and possession of stolen property. Glover stated that he had not been offered anything in exchange for his testimony..
At trial, Glovef identified the defendant, as someone he knew- and spent time with while in Orleans Parish Prison.. He stated that the defendant told him that he had been drinking and told his brother about his involvement in Ernest Smith’s murder. The defendant told Glover that he was offered money by his brother and his girlfriend to kill Ernest Smith. The defendant stated that he waited for Ernest Smith outside of his house. When Ernest Smith arrived home, the defendant ran up to him and shot him in the chest twice. The defendant told Glover that Emma was known for setting up her husbands. The defendant stated that his brother and ImEmma eventually .married,, and, his brother was killed. The defendant thought that Emma had something to do with his brother’s murder. He stated that he..was not involved in his brother’s murder.
ERRORS PATENT
A review of the record for patent errors reveals that the trial court granted the defendant’s motion for appeal prior, to sentencing the defendant. Although an appeal may be taken only from a conviction and sentence, this Court has held that it is not necessary to dismiss an appeal taken after conviction but before sentencing because “[dismissing the appeal would *256 simply result in a delay of the appellate process and hinder defendant’s right to appeal.” State v. Martin, 483 So.2d 1223, 1225 (La.App. 4th Cir.1986). See also State v. Pleasant, 2011-1675, pp. 16-17 (La.App. 4 Cir. 10/17/12), 102 So.3d 247, 256; State v. Carter, 2013-0074, p. 6 (La. App. 4 Cir. 12/11/13), 131 So.3d 153, 158. Thus, this patent error requires no action.
DISCUSSION
DEFENSE COUNSEL’S ASSIGNMENT OF ERROR
In this assignment, the defendant argues that the State failed to produce sufficient evidence that he was the person who shot and killed Ernest Smith. The defendant contends that the- jury’s decision to accept the testimony of Enoch Raine, William Fowler, Jr., Henry- Fowler and Donald Glover was irrational.
Wien'reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light Inmost favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 2000-0674, p. 9 (La.6/29/01) 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. See State v. Shapiro, 431 So.2d 372, 378 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Neal, 2000-0674 at p. 9, 796 So.2d at 657 (citing State v. Rosiere, 488 So.2d 965, 968 (La. 1986)). See also State v. Brown, 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 19.
Nevertheless, the reviewing court may not disregard-its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1309-11 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. Mussall, supra. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process óf law. Mussall, supra.
| ^Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the jury’s trial function. State v. Scott, 2012-1603, p. 11 (La.App. 4 Cir. 12/23/13), 131 So.3d 501, 508; See also State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Rosiere, 488 So.2d at 968 (La.1986); State v. Jones, 537 So.2d 1244, 1249 (La.App. 4th Cir.1989). Rather, the appellate court reviews the evidence to determine whether it meets minimal constitutional sufficiency standards. Jackson v. Virginia, supra, The appellate court is highly deferential to the trier of fact. *257 State v. Smith, 2011-664, p. 4 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 381. The jury can accept as true the testimony alone of any witness, even a single witness. State v. Sanchell, 2011-1672, p. 6 (La.App. 4 Cir. 10/31/12), 103 So.3d 677, 680.
In the present case, the defendant was convicted of second degree murder. Second degree murder is defined as the “killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1 A(l). The testimony of Enoch Raine, William Fowler, Henry Fowler and Donald Glover provides sufficient evidence to support the defendant’s conviction for the second degree murder of Ernest Smith.
The defendant suggests that the jury’s decision to accept the testimony of these witnesses was erroneous and not reasonable. He contends that Enoch Raine, William Fowler and Henry Fowler’s testimony should have been suspect because they were all related to James Raine and may have received a portion of James Raine’s estate if the defendant was found guilty. The defendant also asserts that Glover’s credibility should have been questioned because of the potential for a plea 11BdeaI in Glover’s pending case. These issues were presented to the jury through cross-examination by defense counsel. The jury was aware of the relationship between the defendant, Enoch Raine, William Fowler and Henry Fowler. The jury was also informed about Glover’s prior convictions and his pending case. Glover specifically stated at trial that at the time he was testifying he had not been given any incentive by the State to testify. The jury heard the testimony of the witnesses, assessed their credibility and chose to accept their testimony that the defendant confessed to them that he killed Ernest Smith.
Additionally, a review of the testimony provided by these witnesses in conjunction with the testimony of the investigating police officers, crime lab technicians and pathologist reveals that the witnesses testified as to information that could only have been known by the person who killed Ernest Smith.
Enoch Raine, William Fowler, Henry Fowler and Donald Glover all testified that the defendant told them that he waited outside the abandoned apartment building where Ernest Smith and Emma were living for Ernest Smith to arrive home. He had been waiting for about one and one-half hours when Ernest Smith and another man pulled up. Ernest Smith and the man talked for about fifteen to twenty minutes before the man left. After the man left, the defendant came from around the building, went up to Ernest Smith and shot him twice in the chest with a nine millimeter gun. He threw the gun in Lake Pontchartrain as he drove over I — 10 on his way home.
This evidence was corroborated by the testimony of Ronald Mason, who stated that when he and Ernest Smith arrived back at Ernest Smith’s house, they talked outside for about fifteen minutes before Mason left. Dr. Tracy, the pathologist, testified that Ernest Smith was shot tvkiee in the chest area and that |14both shots could have been fatal. Officer Kenneth Leary testified that the casings found on the ground where the victim had been shot were fired from a nine millimeter gun.
This assignment is without merit.
CONCLUSION
Accordingly, based upon the record before this Court, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. 'Co-defendant Emma Smith/Raine(“Emma”) was also named in the indictment. Emma was also indicted with one count of second degree murder for her role in the death of Ernest Smith. Her case was severed from the defendant on December 2, 2014, and the State proceeded to trial on Alfred Everette’s case.

. The parties stipulated to the content of the 911 incident recall. The 911 incident recall provided that the 911 call was received.at 11:32 p.m. on April 12, 2006. The officer was dispatched at 11:34 p.m. and arrived on the scene at 11:39 p.m.